IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,310

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL TREVON LEWIS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Determining whether an appellate court has jurisdiction raises a question of law over which the scope of appellate review is unlimited.

2.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. This standard applies to convictions arising from bench trials as well as those arising from jury trials. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. Furthermore, there is no distinction between direct and circumstantial evidence in terms of probative value. Accordingly, a conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the factfinder has the right to make the inference.

1

3.

Whether a defendant waived the right to a jury trial is a factual question, subject to analysis under a substantial competent evidence standard of review. But when the facts of the district court's determination to accept a jury trial waiver are not disputed, the question whether the defendant voluntarily and knowingly waived the jury trial right is a legal inquiry subject to unlimited appellate review.

4.

In a felony case, a criminal defendant may waive the fundamental right to a jury trial if the court and State agree to the waiver. But jury trial waivers should be strictly construed to ensure that the defendant has every opportunity to receive a fair and impartial trial by jury.

5.

The test for determining a waiver's validity is whether it was voluntarily made by a defendant who knew and understood what he or she was doing. Whether that test is satisfied depends upon the particular facts and circumstances in each case. For a criminal defendant to effectively waive his or her right to a jury trial, the defendant must first be advised by the court of his or her right to a jury trial, and he or she must personally waive this right in writing or in open court for the record. A waiver will not be presumed from a silent record.

6.

In cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the defendant shows bad faith on the part of the State. The determination of the question of bad faith turns on the officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed, and the question of

bad faith is a question of fact. Accordingly, the district court's factual findings regarding the presence or absence of bad faith are reviewed under a substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review.

7.

An illegal sentence can be corrected at any time. The question of whether a sentence is illegal is a question of law over which this court has unlimited review. An illegal sentence is a sentence imposed by a court without jurisdiction, a sentence which does not conform to the statutory provision, either in character or the term of the punishment authorized, or a sentence which is ambiguous with regard to the time and manner in which it is to be served.

8.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. Cumulative error, however, will not be found when the record fails to support the errors raised on appeal by the defendant.

Appeal from Johnson District Court; PETER V. RUDDICK, judge. Opinion filed February 20, 2015. Convictions affirmed, sentence vacated in part, and case remanded with directions.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, argued the cause, and *Rachel L. Pickering*, of the same office, was on the briefs for appellant.

*Steven J. Obermeier*, senior deputy district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

3

The opinion of the court was delivered by

ROSEN, J.: After a bench trial, Michael Trevon Lewis was found guilty of felony murder and aggravated robbery. Lewis received a hard 20 life sentence for the felony-murder conviction and a consecutive 61-month prison sentence for the aggravated robbery conviction. The district court also imposed lifetime parole for both convictions.

On direct appeal before this court, Lewis argues: (1) the State presented insufficient evidence to convict him of either felony murder or aggravated robbery; (2) he did not knowingly and voluntarily waive his right to a jury trial; (3) the district court erred in denying his motion to dismiss the charges against him based on the alleged destruction of potentially exculpatory evidence; (4) the district court erred in imposing lifetime parole in connection with the aggravated robbery conviction; and (5) the cumulative effect of the alleged trial errors deprived him of a fair trial.

Before focusing on these issues, we address whether the notice of appeal filed in this case was sufficient to confer jurisdiction on this court over all the issues Lewis raises on appeal. We conclude that it was sufficient to confer jurisdiction over all the issues. Addressing the merits of the issues, we agree with Lewis that the district court erred in imposing lifetime parole in connection with his aggravated robbery conviction. Thus, we vacate that portion of his sentence and remand for resentencing. But, we reject his other alleged errors and, accordingly, affirm his convictions.

FACTS

Because Lewis challenges the sufficiency of the circumstantial evidence used to convict him of the charged crimes, a detailed recitation of the evidence presented at his bench trial is warranted.

Curley Tyler, the victim in this case, and his son, Eshawn, lived together at an apartment complex in Shawnee, Kansas. Tyler and Eshawn made their living by buying and selling automobiles. Sometime in early 2010, Lewis, a family friend, began renting a Mercedes Benz from Tyler. Later, the two reached an agreement where Lewis would begin making payments toward the purchase of the car.

During the evening of April 3, 2010, the day before Easter, Tyler went out to dinner with his girlfriend, Sabrina Steen; Steen's son, Ben; and Tyler's nephew, Emmanuel. After dinner, the group, riding in Tyler's Cadillac Escalade, went to a church fundraiser for an acquaintance of Tyler's. After the fundraiser, the group stopped at a Walmart located near I-435 and Shawnee Mission Parkway (close to Tyler's apartment) so Steen could purchase an Easter egg coloring kit.

While Steen shopped, Tyler and the others remained inside the Escalade. During this time, Tyler spoke on his cell phone with Lewis. Though Emmanuel could only hear Tyler's side of the conversation, Emmanuel said that the two men spoke about Lewis paying money he owed to Tyler for renting the Mercedes Benz. According to Emmanuel, Tyler tried to convince Lewis to bring the money to him in Shawnee, but Tyler ultimately agreed to meet Lewis in Grandview, Missouri.

The group eventually left Walmart and arrived back at Tyler's apartment. Once at the apartment, Tyler changed into different clothes and told Steen that he was going to take Emmanuel back to his home. Tyler then planned to meet Lewis so Lewis could pay

him the money he owed for the car. After meeting Lewis, Tyler planned on stopping by his grandson's house to deliver clothes to him for Easter services the next day and then planned on stopping by his brother Alfred's house to cut Alfred's hair.

Tyler and Emmanuel left the apartment in Tyler's Escalade sometime after 11 p.m. Shortly after they left, Tyler's son, Eshawn, arrived back at the apartment. On the way to Emmanuel's home, Tyler told Emmanuel that he was going to Grandview, Missouri, to pick up some money from Lewis and asked Emmanuel if he would go to Grandview with him. Emmanuel declined. Tyler eventually dropped Emmanuel off at his home sometime around 11:30 p.m. Ultimately, Tyler never delivered the clothes to his grandson nor did he ever arrive at Alfred's house to cut his hair.

Because Tyler was late in returning to his apartment, Steen began calling his cell phone at around 1 a.m. on April 4 and proceeded to call Tyler's phone numerous times throughout the night, but Tyler never answered his phone.

Cody Martin, a 13-year-old boy who lived with his mother in the same apartment complex as Tyler, had been up watching TV but was heading to bed when he heard "two loud metal clings." Martin told a detective that he believed he heard the clings at around 2 a.m., but later testified at trial that he was not sure when he heard the sounds. He also was not positive whether he had heard two distinct sounds and conceded that it might have been one sound and its echo. Regardless, about 5 minutes after hearing the sounds, Martin looked out his bedroom window and saw what appeared to be a man sleeping inside a pearl white Escalade parked in front of Martin's apartment. Martin said that the man's body was lying between the two front seats of the Escalade.

Shanaya Kane, another resident of the apartment complex, arrived back at her apartment with her boyfriend sometime shortly after 4 a.m. As they pulled into Kane's

6

parking space, they noticed a pearl white Escalade parked in the next stall over. Kane did not recognize the vehicle.

At around 6 a.m., Steen woke Eshawn and told him that Tyler had not come home and was not answering his phone. Steen asked Eshawn to go look for Tyler. Eshawn called Tyler's phone several times, but Tyler never answered his phone.

Eshawn looked out the front of the apartment and saw that Tyler's Escalade was not parked in its usual spot. At approximately 6:45 a.m., Eshawn looked through a back window of the apartment and saw Tyler's Escalade parked outside. Eshawn went outside and saw that Tyler's body was lying inside the vehicle. Law enforcement responded to the scene shortly thereafter.

Tyler was found lying face down on the front passenger seat, his midsection draped over the console, and his legs positioned behind the driver's seat. It was later determined that Tyler had suffered a single bullet wound to the back right of his head; the bullet exited near his left temple. The bullet was ultimately found between the frame of the front driver's side door and the dashboard. On the floor mat in front of the rear passenger-side seat, investigators found a spent .10 millimeter shell casing.

Tyler's bullet wound and subsequent blood splatter analysis indicated that Tyler was sitting upright in the front driver's seat when he was shot and that whoever shot Tyler did so while sitting behind him and to his right.

Additional blood splatter analysis showed that Tyler, after being shot, remained in an upright position for an indeterminate amount of time. His body was then moved into the position it was found in—lying face down on the front passenger seat with the midsection draped over the center console and the legs extended behind the driver's seat.

7

A large amount of blood pooled along the bottom of the front passenger door, eventually dripping out of the interior of the Escalade. One blood-flow pattern found outside the car suggested that the Escalade may have been moving after Tyler started bleeding; however, the detective performing the analysis could not definitively say whether this was so. Notably, a yaw mark on the parking lot surface near the front driver's side tire indicated that the Escalade had made a hard right turn into the parking stall. The detective also indicated that based on blood transfer stains found on the driver's seat, it was possible that someone else sat in the driver's seat after Tyler's body was moved.

Though Tyler was known for carrying a large amount of cash (Eshawn believed that his father had approximately $3,000 in cash on him when he met Lewis) and a cell phone, neither cash nor a cell phone were found on Tyler or inside the Escalade. In fact, the pockets of his pants were found turned inside out as if someone had gone through them, and the cell phone holder clipped to the waist of his pants was empty.

After Tyler's body was discovered, members of Tyler's family began calling Lewis' phone that morning, informing him of Tyler's death and asking him whether he had met with Tyler the previous night. Michael Tyler, Tyler's nephew and Alfred's son, called Lewis, and Lewis told Michael that he had heard what had happened and was on his way to the apartment complex. Later, when Lewis failed to arrive at the apartment complex, Michael called Lewis again to ask where he was, and Lewis told him that people were threatening him. Notably, Lewis told Michael that he had met Tyler the previous night at Lewis' mother's house near Sixth and Parallel in Kansas City, Kansas, and that he had given Tyler some money.

At 12:35 p.m. on April 4, a police officer with the Shawnee Police Department called Lewis' cell phone. Lewis never answered his phone, so the officer left a voice message asking him to contact the police so they could discuss Tyler's murder. Lewis

8

never contacted police. Later, on April 7, 2010, law enforcement made a request to Sprint Nextel, Lewis' cell phone carrier, to ping Lewis' cell phone, *i.e.*, determine which cell tower and tower sector the phone had recently used. Based on the information Sprint provided, law enforcement determined that the cell phone was pinging off of a tower and sector that serviced the area where Lewis' mother's house was located in Kansas City. That same day, a detective with the Shawnee Police Department went to the house. As the detective looked inside the house for Lewis, the detective called Lewis' cell phone, and a cell phone began ringing inside the house. Upon locating the phone, the detective took possession of it. Police also located the Mercedes Benz that Lewis had rented from Tyler at an apartment complex located in Kansas City, Kansas.

About a week after the homicide, members of Tyler's family learned that Lewis was in Long Beach, California, and passed the information on to law enforcement. A detective with the Shawnee Police Department forwarded the information to police in Long Beach. On April 12, 2010, Long Beach police arrested Lewis. That same day, detectives with the Shawnee Police Department flew out to Long Beach to interview Lewis.

The detectives learned that Lewis, during his trip to California, had stopped in Las Vegas to visit his sister, Jessica McDonald. After interviewing Lewis, the detectives traveled from Long Beach to Las Vegas to speak with McDonald. McDonald confirmed that Lewis had stopped at her house on the way to California and that the two of them spoke for about an hour. During their conversation, Lewis told McDonald that he had nothing to do with Tyler's murder.

Near the end of the detective's interview with McDonald, she asked them whether Tyler had been robbed. At trial, McDonald claimed that she had asked the question

9

because, during the interview, the detectives were continually asking her whether Lewis had given her any money. McDonald stated that Lewis only gave her $5.

After Lewis was taken into custody, prints of his fingers and palms were taken as well as a sample of his DNA. Lewis' right palm print was found on the exterior of the Escalade's rear driver's side door. His left palm print was found on two different locations on the interior of the Escalade's rear driver's side door frame. His left thumb print was also found on the rear driver's side door frame. Notably, prints of Lewis' left palm and fingers were found on the interior handle of the rear passenger's side door. The placement of the prints on the handle was consistent with Lewis using his left hand to reach across his body to open the rear passenger's side door (evidence presented at trial established that Lewis is right handed). Finally, Lewis' DNA was found on the interior manual lock mechanism of the front driver's side door.

During the course of the investigation into Tyler's murder, law enforcement obtained Tyler's cell phone records from T-Mobile. These records showed that between 10:53 p.m. and 11:52 p.m. on April 3, 2010, Tyler's phone pinged off cell towers that were along a route of travel consistent with moving east from Johnson County, Kansas, into Kansas City, Missouri, and then south on Highway 71 toward Grandview, Missouri. Notably, the last activity recorded for Tyler's cell phone was an 11:52 p.m. call made to Lewis' cell phone. In making this call, Tyler's phone first pinged off the southeast side of a tower located at 5701 Longview Road in Kansas City, Missouri—just east of Highway 71. When the call ended 3 minutes later, Tyler's phone was pinging off the southwest side of a tower located at 7205 Longview Road in Kansas City, Missouri—further east on Longview Road.

Lewis' cell phone records from Sprint Nextel showed that he was contacted by Tyler numerous times on April 3, 2010.

- Lewis' phone received a call from Tyler's phone at 12:23 p.m. on April 3, 2010. Lewis' phone pinged off the north side of a tower located at 6111 East 129th Street in Grandview, Missouri—just east of Highway 71.

- At 5:11 p.m., Lewis' phone received a call from Tyler's phone. Lewis' phone first pinged off the north side of the tower located at 6111 East 129th Street in Grandview. When the call ended, Lewis' phone was pinging off the east side of a tower located at 12407 Grandview Road in Grandview.

- At 6:09 p.m., Lewis' phone received a call from Tyler's phone. Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview.

- At 7:36 p.m., Lewis' phone received a call from Tyler's phone. Lewis' phone pinged off the east side of the tower located at 12407 Grandview Road. When the call ended, the phone was pinging off the north side of the tower located at 6111 East 129th Street in Grandview.

- At 10:42 p.m., Lewis' phone received a call from Tyler's phone. Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview.

- At 11:33 p.m., Lewis' phone received a call from Tyler's phone. Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview.

- At 11:52 p.m., Lewis received a final call from Tyler. Again, this was the last call or activity recorded for Tyler's phone. During this call, Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview.

After this call, Lewis' phone called Kelcy Shackelford's cell phone at 11:57 p.m. (Shackelford was a former girlfriend and high school classmate of Lewis'. The two were close friends. Phone records showed that they had been in contact with each other throughout the day on April 3.) During this phone call, Lewis' phone pinged off the east side of the tower located at 12407 Grandview Road in Grandview. Shackelford's phone (a

Verizon Wireless phone) pinged off of a tower located at 5301 Martha Truman Road in Grandview.

Records showed that Lewis and Shackelford continued to contact each other throughout the early morning and showed which cell towers their respective phones used to complete each call.

- At 12:33 a.m. on April 4, 2010, Lewis' phone called Shackelford's phone. Lewis' phone pinged off a tower located at 11308 Blue Ridge Boulevard—near the intersection of Blue Ridge Boulevard and Longview Road in Kansas City, Missouri. Shackelford's phone pinged off the tower located at 5301 Martha Truman Road in Grandview.

- At 12:36 a.m., Lewis' phone received a call from Shackelford's phone. Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview. Shackelford's phone pinged off the tower located at 5301 Martha Truman Road in Grandview.

- At 12:38 a.m., Lewis' phone called Shackelford's phone (the call lasted 13 seconds). During this call, Lewis' phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview. After this call ended, Shackelford's phone immediately called Lewis' phone back. During this second call, Lewis' phone pinged off the tower located at 11308 Blue Ridge Boulevard in Kansas City, Missouri. Shackelford's phone pinged off the tower located 5301 Martha Truman Road during both calls.

- At 12:40 a.m., Lewis' phone called Shackelford's phone. Lewis' phone again pinged off the tower located at 11308 Blue Ridge Boulevard in Kansas City. Shackelford's phone pinged off the tower located at 5301 Martha Truman Road.

- Between 12:41 and 12:50 a.m., Lewis and Shackelford exchanged a series of text messages. Cell tower information for the text messages was not collected.

- At 1:34 a.m., Shackelford's phone called Lewis' phone. Lewis' phone first pinged off the north side of the tower located at 6111 East 129th Street in Grandview. When the call ended, Lewis' phone was pinging off the southeast side of a tower located at 9801 Bunker Ridge Road in south Kansas City, Missouri. Shackelford's phone again pinged off the tower located at 5301Martha Truman Road.

- At 1:59 a.m., Shackelford's phone called Lewis' phone. Lewis' phone first pinged off the north side of a tower located at 15400 Midland Drive in Shawnee, Kansas. When the call ended, Lewis' phone was pinging off the northwest side of a tower located at Reynolds Lawn and Leisure, 12902 Shawnee Mission Parkway in Shawnee. Notably, this tower is just east of Tyler's apartment complex and is visible from the complex. Furthermore, this is the same tower Eshawn Tyler's cell phone (also a Sprint phone) pinged off of later that morning when Eshawn was calling Tyler's cell phone, attempting to locate him.

  During the 1:59 a.m. phone call, Shackelford's phone first pinged off a tower located at 7700 Cottonwood Street in Lenexa, Kansas. When the call ended, Shackelford's phone was pinging off a tower located at 6875 Mauer Road in Shawnee.

- At 2:09 a.m., Shackelford's phone called Lewis' phone. Though tower information for Lewis' phone was not recorded by Sprint, records kept by Verizon showed that Shackelford's phone pinged off the tower located at 6875 Mauer Road in Shawnee.

- At 2:11 a.m., Shackelford's phone called Lewis' phone. Again, tower information for Lewis' phone was not recorded by Sprint. Verizon's records showed that Shackelford's phone again pinged off the tower located at 6875 Mauer Road in Shawnee.

- At 2:35 a.m., Shackelford's phone made an outgoing call. The phone pinged off of a tower located at 6415 State Avenue, Kansas City, Kansas.

The next time cell tower information was recorded for Lewis' phone was at 8:04 a.m. on April 4 when he made an outgoing call. His phone pinged off the north side of the tower located at 6111 East 129th Street in Grandview, Missouri.

13

After Shackelford's 2:35 a.m. phone call, the next activity recorded on her phone was an outgoing call made at 8:28 a.m. The phone pinged off the tower located at 5301 Martha Truman Road in Grandview, Missouri.

Notably, the cell phone records obtained by law enforcement for Lewis' phone documented activity between March 21 and April 7, 2010. The records showed that the only time Lewis' phone ever pinged off of the towers located at 15400 Midland Drive and 12902 Shawnee Mission Parkway was when he received a call from Shackelford at 1:59 a.m. on April 4.

Because cell phone records showed that Lewis and Shackelford contacted each other numerous times between the late evening and early morning hours of April 3 and 4, 2010, detectives with the Shawnee Police Department contacted Shackelford and spoke with her at her home in Kansas City, Kansas, on April 12. Initially, Shackelford claimed that the last time she spoke with Lewis was prior to the Easter weekend. But after the detectives informed her that phone records showed that she was in contact with Lewis multiple times between April 3 and 4, she admitted to speaking with him during that time period.

When asked about her activities during the late evening and early morning hours of April 3 and 4, Shackelford said that she was out "clubbing." She could not, however, recall any names of places she went to that night or identify any people that she had been with or seen. She denied seeing Lewis that night. When asked whether she was in Kansas or Missouri that night, Shackelford said Missouri. A detective then asked Shackelford what she was doing in Shawnee at 1:59 a.m. on April 4. Shackelford answered that she was clubbing. Shackelford's 1999 Pontiac Grand Am was subsequently taken into custody and the interior was examined for the presence of blood. All tests came back negative.

The State charged Lewis with alternative counts of first-degree premeditated murder and felony murder and charged him with one count of aggravated robbery. His case proceeded to a bench trial where the State, in addition to the above evidence, presented the testimonies of three cell phone company representatives and the testimony of an expert witness specializing in tracking cell phone activity.

Gavin Pinchback, T-Mobile's representative, explained that a cell phone tower basically consists of a pole and three groupings of antennas surrounding it called sectors. When a cell phone makes or receives a call, it will generally ping off the tower with the strongest signal and ping off the tower sector which is facing the phone. Pinchback said that in most cases, a cell phone will ping off of the closest tower because that tower's signal will likely be the strongest amongst the other towers in the area. Pinchback said that the range of T-Mobile's towers is between 1/8 of a mile and 5 miles, depending on the specific tower and the conditions in the area at the time of the call.

Pinchback also indicated that when a phone pings off of two different towers during a single phone call, it most likely (but not necessarily) means that the phone is being moved during the phone call.

Pinchback indicated that the technology used to locate a phone for emergency purposes (*e.g.*, when 911 is dialed on a cell phone) is much more accurate in determining that phone's location than compared to simply looking at records showing what towers and sectors a cell phone pinged off of during a particular call. Pinchback noted, however, that the technology used to pinpoint a cell phone's exact location can only be used when the phone is currently in use.

15

On cross-examination, Pinchback conceded it was possible that a cell phone could ping off a tower's sector that is not facing the direction of where the cell phone is located. Subsequently, the following exchange took place:

"Q. [DEFENSE COUNSEL] Is it also possible that a cell phone would skip the tower close to it and connect with another tower which is not geographically closest to the phone?

"A. [PINCHBACK] Yes, that is possible.

"Q. In light of that I would assume, then, that this sort of fashion is kind of rudimentary in terms of being a reliable way to actually determine someone's location. Would that be a fair statement?

"A. Okay. Yes.

"Q. The strongest signal from a tower doesn't necessarily mean that the tower is the closest tower based upon your testimony; correct?

"A. That is correct."

Jennifer Scheid, the subpoena specialist and custodian of records for Sprint Nextel, testified that in the Kansas City area, Sprint's cell phone towers have a range of between 2 and 10 miles, depending on location. In more urban areas, the range would be closer to 2 miles, and in more rural areas, the range would be up to 10 miles.

On cross-examination, Scheid stated that when a phone call is placed, the tower providing the strongest signal in relation to the cell phone would be the tower that handles the call. She conceded that the tower with the strongest signal would not necessarily be the one that is closest to the cell phone. Scheid also said that a cell phone could ping off a tower's sector that is not facing the direction of where the cell phone is located.

Brett Diebolt, the records custodian for Verizon Wireless, explained that a cell phone will ping off the tower closest to it depending on network availability. He noted

16

that 2 a.m. is generally not a high-traffic time for Verizon's network. He also said the potential range of Verizon's towers is between 3 and 5 miles.

Diebolt acknowledged on cross-examination that simply looking at records showing which tower and sector a cell phone pinged off of during a phone call will not give you the exact location of where the cell phone was during the call. Accordingly, the best approximation he could give regarding the location of Shackelford's cell phone during the calls at issue was that the phone was within 3 to 5 miles of each tower that it pinged off of during the calls.

John Hauger, a special agent with the Federal Bureau of Investigation and member of its Cellular Analysis Survey Team (CAST), testified for the State. Hauger said that CAST members "are experts in the field of cellular technology, either in historical cell site analysis, or in geo[graphical] location of cell phones which is a fancy way of saying finding a cell phone." He further said that he had experience in performing a historical plotting of call detail records.

Hauger explained how a cell phone works:

"Cell phones are basically a two-way radio. I think we all had them when we were kids; talks back and forth to a tower. The tower authenticates who it's talking to. So, you know—so, the tower knows your phone is indeed a paying customer. Each tower[] is divided up into three separate sectors, and the—part of the phone will go to the tower/sector which it—which has the strongest signal. So, your phone, everybody's phone, as I said earlier, is constantly scanning their environment, looking for the best signal, and your phone knows where to go when you make a call or when you receive a call. So, your cell phone as we speak, if your cell phone's on here now in Court, it's looking for the closest tower—excuse me, the strongest tower, which most of the time is the closest."

17

Hauger said that the only thing that really affects a cell network is some kind of big event which causes many people to use their cell phones at once, such as reacting to a disaster. He indicated that mornings and evenings—times when people are normally using their phones—would not generate the volume of usage that would affect the coverage of a cell phone tower. Hauger said that the early morning hours of April 4, 2010, would not have been a high usage time for a cell tower.

Hauger reviewed Lewis' cell phone records and plotted out on a map which towers and sectors the phone pinged off of between 12:38 a.m. and 8:04 a.m. on April 4, 2010. Hauger noted that between 12:38 a.m. and 1:35 a.m., Lewis' phone pinged off of three different towers located along Highway 71 near Grandview, Missouri. Then, between 1:59 and 2 a.m., Lewis' phone pinged off of the two towers in Shawnee, Kansas. Hauger stated going normal highway speeds, the distance between the tower that Lewis' phone pinged off of at 1:35 a.m. and the tower his phone initially pinged off of at 1:59 a.m. could be traveled within 25 minutes.

Using software that allowed him to determine the range of a cell phone tower while driving in the area, Hauger identified on a map the two areas in Shawnee where a Sprint cell phone would have to be in order to ping off the two Sprint towers Lewis' phone pinged off of during the 1:59 a.m. phone call. Notably, both areas are near Tyler's apartment complex.

Hauger noted that a cell phone will use different towers to stay connected as it is being moved through an area. Based on the results of his driving test, he concluded that Lewis' phone was being moved during the 1:59 a.m. call.

Hauger was specifically asked whether a cell phone located in Grandview, Missouri, during the early morning hours of April 4, 2010, would have pinged off the

18

towers located at 15400 Midland Drive and 12902 Shawnee Mission Parkway. Hauger said no.

During cross-examination, Hauger said that it was possible, but unlikely, that a cell phone would ping off a tower sector that was not facing in the direction of where the cell phone was located. In order for the phenomenon to occur, Hauger said that there would have to be some obstacle—like a large building—to refracture the radio waves. Hauger noted that there were no large structures in the Shawnee area surrounding the two towers that would have caused radio waves to refracture.

Konstantino Dimitrelos, the owner of Cyber Forensics 360 (a company that provides cyber forensics, cellular forensics, and cellular triangulation services), testified as an expert witness for Lewis.

Dimitrelos reviewed Lewis' cell phone records, which he referred to as cellular historical data reconstruction records or CHDR records for short. He said CHDR records show "call patterns and vicinity or approximating where a phone can be but defining where a phone cannot be." He later added that CHDR records are never accurate for locating a phone, but they are excellent in determining where a phone is not.

Notably, Dimitrelos stated that it would be misleading or even false to say that any particular cell phone tower services a particular location. But on cross-examination, Dimitrelos seemed to contradict himself when he indicated that based on CHDR records showing which tower and sector a cell phone pinged off of during a call, he could determine the general location of where the phone was at during the call based on the area serviced by the tower and sector.

Dimitrelos testified that a cell phone is always communicating with three separate towers and will ultimately use the tower with the strongest signal to place a call. He stated that numerous things—physical structures, waterways, the weather, the distance from a tower—determines a cell phone's ability to connect with a specific tower. Dimitrelos indicated, however, that network traffic would not have been an issue during the late evening and early morning hours of April 3 and 4.

Dimitrelos said it was completely normal for a cell phone to ping off two different towers during a single phone call—a phenomenon which he stated does not necessarily result from the phone being moved during the call. Dimitrelos did not find it remarkable or unusual that Lewis' phone pinged off two different towers during the 1:59 a.m. call with Shackelford. Dimitrelos also indicated that it would be possible for a cell phone located inside a store on the north side of Shawnee Mission Parkway to ping off of the two towers that Lewis' phone pinged off of during the 1:59 a.m. call.

On cross-examination, Dimitrelos indicated that he had used the same software and testing method employed by Agent Hauger to determine where a cell phone would have to be in order to ping off a particular tower and sector. Notably, during Dimitrelos' cross-examination, he was shown a print out of a webpage from his company's website. The print out was introduced into evidence. The webpage states that "[o]nce the CDR and tower information is obtained, mapping diagrams are produced related to specified call activity." The webpage shows an example of using cellular reconstruction to denote on a map "a direction of travel or movement based on call patterns and sector activity."

Dimitrelos conceded that the cell phone tower information in this case was not overlooked and that the in-field environmental survey referenced on his company's website was the same methodology employed by Agent Hauger in preparing his report. In

fact, Dimitrelos conceded that the information on his company's website supported "the very methodologies and the mechanisms that Agent Hauger used in this case."

Lewis testified at his trial and specifically denied killing Tyler, who he considered a friend. Lewis said that in April 2010, he was living by himself in an apartment on the "borderline" between Kansas City, Missouri, and Grandview, Missouri. When asked, Lewis could not remember the address to his apartment. Lewis said that he would also occasionally stay at his mother's house and at the house of one of Tyler's nephews.

Lewis said he earned money by being a care provider for his grandmother, gambling, and selling marijuana and cocaine. Lewis said that he was a member of a drug dealing enterprise headed by Tyler and that Tyler supplied him with drugs to sell. Notably, when law enforcement searched Tyler and Eshawn's apartment, they found a ziplock-type bag containing nine individually-wrapped bags full of a green leafy substance that they believed was marijuana. Additionally, Kiarah Carter, an acquaintance of Lewis', testified that she had purchased marijuana from Lewis in the past and that he had informed her that Tyler and his sons were his suppliers.

In an apparent attempt to explain why his DNA was found on the manual lock mechanism of the Escalade's front driver's side door, Lewis testified that he had rented Tyler's Escalade on five separate occasions between November 2009 and March 2010. Specifically, Lewis claimed that for his birthday on November 7, 2009, he rented the Escalade from Tyler. Lewis said that he and his friend, Daniel Rowe, went out that night in the Escalade and eventually had sex with two women inside the vehicle. Rowe testified at trial and corroborated Lewis' story. Furthermore, Lewis' sister, McDonald, testified that in November 2009, she remembered Lewis driving an Escalade. Lewis told her that he had rented the vehicle for his birthday. Furthermore, Carter said that sometime in late

February or early March 2010, she and her sister went to dinner with Lewis. Carter said that Lewis drove Tyler's Escalade to the dinner.

Lewis also said that on March 27, 2010, he rode in the Escalade with Eshawn Tyler and others to and from a party in Lawrence. Lewis said at a couple points during the evening, he sat in the driver's seat of the Escalade and may have touched the driver's side door. But when Eshawn testified at trial, he denied that Lewis rode in the Escalade during the evening of March 27. He also said that Tyler was very particular about whom he would allow to drive the Escalade. Eshawn specifically said that his father never let Lewis drive the Escalade.

Steen, Tyler's girlfriend, and Alfred, Tyler's brother, both stated that Tyler never rented his Escalade, and Alfred said that he never recalled seeing Lewis in the Escalade. Emmanuel, Tyler's nephew, said that he was not aware of his uncle ever renting the Escalade to Lewis. Finally, when police spoke with Lewis' friend, Rowe, on April 9, 2010, he claimed that the only vehicle he was aware of Lewis driving the month prior to Tyler's murder was a silver Mercedes Benz.

Regardless of whether Lewis had access to the Escalade prior to April 3 and 4, the State presented evidence to suggest that any DNA left by Lewis inside the vehicle would have been removed prior to Tyler's murder. Numerous witnesses testified that Tyler constantly cleaned the interior and exterior of his Escalade. In fact, David Lucas, an acquaintance of Tyler's, said that he ran into Tyler at a car wash on April 2, 2010, and saw him cleaning the interior and exterior of the Escalade.

Lewis said that on April 3, 2010, he was supposed to meet Tyler in order to pay him back rent for the Mercedes Benz and to make a payment towards the purchase of the vehicle. In total, Lewis said he owed Tyler $1,300. According to Lewis, Tyler kept

22

calling him throughout the day and putting off the time for their meeting. Eventually, Tyler, after making several phone calls to Lewis asking for directions to his apartment in Grandview, arrived at the apartment sometime between 11:30 p.m. on April 3 and 12 a.m. on April 4.

According to Lewis, Tyler remained sitting in his Escalade. In an apparent attempt to explain why his prints were found on the interior and exterior of the rear driver's side door and on the interior handle of the rear passenger side door, Lewis stated that he entered the Escalade through the rear driver's side door. Lewis explained that he did this because he could not tell whether someone was already sitting in the front passenger seat (the windows of the Escalade are tinted). After entering the Escalade, Lewis said that he realized that Tyler was by himself in the vehicle. Tyler told Lewis to get into the front passenger seat, so Lewis slid across the rear passenger seat, exited the vehicle through the rear passenger door, and got into the front passenger seat.

Lewis said that once he was sitting in the front passenger seat, he pulled his money out, counted out $1,300, and handed it over to Tyler. The two men then spoke briefly before Tyler left the apartment complex. Lewis said that shortly after Tyler left in the Escalade, he called Lewis again asking for directions. After giving Tyler directions, Lewis said that he left his apartment and went to a nearby club. He then proceeded to travel towards his mother's house in Kansas City, Kansas, taking Highway 71 north to I-435 West and eventually to I-435 North.

In explaining why his cell phone pinged off of towers located at 15400 Midland Drive and 12902 Shawnee Mission Parkway in Shawnee when Shackelford called him at 1:59 a.m. on April 4, Lewis said that on his way to his mother's house, he stopped at a gas station and at a Walmart located off of Shawnee Mission Parkway. Notably, the Walmart

23

that Lewis claimed he stopped at was within the servicing area of the tower located at 15400 Midland Drive.

Lewis said that he eventually arrived at his mother's house and picked up some clothes. He then traveled back to his apartment in Grandview and went to sleep. Lewis specifically denied ever seeing Shackelford that night. Later that morning, Lewis proceeded to receive numerous calls from Tyler's relatives asking him about Tyler's whereabouts. Lewis said that Tyler's relatives eventually told him that Tyler had been murdered. Lewis said that the relatives started threatening him because they thought he was responsible for Tyler's murder. (Other evidence presented at trial corroborated Lewis' claim that he received threats from Tyler's family.) Lewis said that he planned on traveling to Tyler's apartment that morning, but Tyler's brother, a pastor, called him and advised him against coming to the apartment complex due to the pastor's fear that more violence would occur.

Because of the threats he was receiving from Tyler's family, Lewis became concerned for his safety. He decided then to leave the Kansas City area on April 10 and travel to California. Lewis said that he planned on returning to the area once the murderer was caught and the situation cooled off.

Lewis said that he rented a car from a friend named B.J. for $300. Lewis said that his mom's friend, Darnell, and two other people (Lewis was unable to remember their names) traveled with him in the rented car to California. Lewis said that after paying the money to rent the car, he had about $300 remaining for the trip. On the way to California, Lewis said that they stopped in Las Vegas to visit with his sister. During their brief visit, Lewis said that his sister asked for $5 so he gave her $5. Lewis said that he eventually arrived in Long Beach, California, where he stayed at his half-brother's father's house for 2 days before being arrested by police.

On February 15, 2012, a few days after the bench trial concluded, the district court judge announced his verdict from the bench, finding Lewis guilty of felony murder and aggravated robbery. In explaining his verdict, the district court judge stated:

"Murder cases often are proved by circumstantial evidence. The victim can't testify. Unless there is a confession or an eyewitness, we have to rely on that other evidence. All of the forensic evidence here was vigorously challenged, but the fingerprints, the DNA, the cell phone evidence, and the plotted movements of those phones do not lie. I do not accept the defense's alternative explanations for that evidence. The substantial evidence of hiding and flight clearly support the State's theory of the case. Frankly I'm not convinced that robbery of a few thousand dollars was the only motive for this murder. I am not convinced that Curly Tyler was shot at the exact location where the Escalade was found.

. . . .

"But the evidence proves beyond a reasonable doubt that the defendant here, Michael Lewis, committed the crimes of first degree felony murder and aggravated robbery, and I find him guilty of those charges."

On February 29, 2012, Lewis filed a motion for a new trial, arguing, among other things, that the evidence presented at trial was insufficient to convict him of the charged crimes and that he was denied "the opportunity for a fair trial and was denied the opportunity to have a trial to a jury 'of his peers,' requiring [him] to waive jury trial to avoid facing an all white or virtually all white jury panel."

At sentencing on April 3, 2012, the district court denied Lewis' motion for a new trial. The court then sentenced Lewis to a hard 20 life sentence for the felony-murder conviction and a consecutive 61-month sentence for the aggravated robbery conviction. In announcing Lewis' sentence from the bench, the district court did not impose parole or postrelease supervision in connection to the felony-murder and aggravated robbery

25

convictions, respectively. In the journal entry of judgment, however, the district court imposed lifetime parole for both the felony-murder and aggravated robbery convictions.

Lewis filed his notice of appeal with the district court on April 9, 2012. The notice of appeal states in its entirety: "COMES now Donald S. Smith, attorney for the defendant, and hereby files his Notice of Appeal as to the judgment and orders of this Court on the 3rd day of April, 2012." The notice of appeal shows that Lewis signed it on April 3 and that a copy of the notice was emailed that same day to the prosecutor.

SUFFICIENCY OF LEWIS' NOTICE OF APPEAL

Because the language of Lewis' notice of appeal seemed to suggest that Lewis was only appealing the district court's judgment and orders made on April 3, 2012 (the date of Lewis' sentencing), we issued an order to the parties asking them to be prepared to discuss at oral arguments whether the notice of appeal filed in this case was sufficient to confer jurisdiction on this court over all the issues Lewis raises on appeal. See *State v. Richard*, 300 Kan. 715, 728, 333 P.3d 179 (2014) (appellate court has duty to question jurisdiction on its own initiative). Determining whether an appellate court has jurisdiction raises a question of law over which the scope of appellate review is unlimited. *State v. Brown*, 299 Kan. 1021, 1027, 327 P.3d 1002 (2014).

At oral arguments, Lewis contended that the language used by trial counsel in the notice of appeal was ambiguous and should not be interpreted as referencing only issues arising at sentencing. Lewis argued that the phrase "judgment and orders" was broad enough to encompass both sentencing and nonsentencing issues and noted that the district court did rule on his motion for a new trial at sentencing, which raised nonsentencing issues. Accordingly, Lewis argued that the notice of appeal was sufficient to confer

jurisdiction over all of the issues he raised on appeal. The State, commendably, agreed with Lewis' argument.

We find that the entirety of the notice of appeal indicates that it was trial counsel's intent to appeal both sentencing and nonsentencing issues. The phrase "judgment and orders" is broad enough to convey this meaning. *Cf. State v. Coman*, 294 Kan. 84, 89-91, 273 P.3d 701 (2012) (notice of appeal stated that defendant was appealing from "the sentence imposed" and specifically described the subject matter of the appeal as the requirement that he register as a sex offender; because notice of appeal "did not even suggest that [defendant] was challenging his conviction," court elected not to address nonsentencing issues, reasoning that "[a]lthough our appellate courts have, at times, liberally construed a notice of appeal to retain jurisdiction, one simply cannot construe a notice that appellant is appealing his or her sentence to mean that he or she is appealing the conviction"); *State v. Wilkins*, 269 Kan. 256, 270, 7 P.3d 252 (2000) (notice of appeal stated defendant was appealing from "'judgment of sentence'"; court accepted defendant's argument that notice of appeal should have read "'judgment *and* sentence'" and, thus, found that notice of appeal was sufficient to confer jurisdiction on the Court of Appeals to determine nonsentencing issues raised in defendant's appeal).

Furthermore, it appears that the phrase "on the 3rd day of April, 2012" is a misplaced modifier and that the notice of appeal should read: "COMES now Donald S. Smith, attorney for the defendant, and on the 3rd day of April, 2012, hereby files his Notice of Appeal as to the judgment and orders of this Court." Though this reading seems somewhat strained, it is supported by the fact that Lewis signed the notice of appeal on April 3 and trial counsel emailed a copy that same day to the prosecutor. Accordingly, we believe that trial counsel meant to reference April 3, 2012, as the date he prepared and intended to file the notice of appeal and not as the date of the occurrences he wished to appeal on behalf of Lewis. Accordingly, we conclude that the notice of appeal filed in

27

this case was sufficient to confer jurisdiction on this court over all the issues Lewis has raised on appeal.

SUFFICIENCY OF THE EVIDENCE

Lewis argues that the State failed to present sufficient evidence to show that he was the person who robbed and murdered Tyler.

When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). This standard applies to convictions arising from bench trials as well as those arising from jury trials. 294 Kan. at 374. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 8, 245 P.3d 1030 (2011). Furthermore, this court has recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *McCaslin*, 291 Kan. 697, Syl. ¶ 9.

The evidence presented at trial showed that Tyler left his apartment in Shawnee around 11 p.m. on April 3 and arrived at Lewis' apartment in Grandview shortly before midnight. Tyler's cell phone placed an outgoing call to Lewis' phone at 11:52 p.m. During this 3-minute phone call, Tyler's phone pinged off of towers in the south Kansas City area near Grandview and Lewis' phone pinged off of a tower in the north part of Grandview. Based on Lewis' testimony acknowledging that he met Tyler on the night of his murder

28

sometime between 11:30 p.m. and midnight, it can be inferred that the two men met shortly after the 11:52 p.m. phone call ended—sometime around midnight on April 4.

Notably, the 11:52 p.m. call on Tyler's phone was the last activity recorded for his phone. Additionally, after meeting with Lewis, Tyler had planned to drop off clothes at his grandson's house and then go to his brother's house to cut his hair. Tyler failed to complete either errand. All of this evidence suggests that something happened to Tyler around the time he met with Lewis.

Because Tyler's body was discovered inside his Escalade—parked in an unusual spot behind his apartment—we know that, somehow, Tyler and his vehicle traveled from Grandview back to Shawnee. Based on Kane's testimony (the resident of the apartment complex who saw the Escalade parked in the stall next to her parking spot) we also know that the Escalade was back at the apartment complex no later than 4 a.m.

Whether Tyler had died during his return trip from Grandview is unknown. Regardless, Lewis' phone records and testimony established that after Lewis met with Tyler, Lewis *also* traveled from Grandview to Shawnee. Lewis' cell phone records showed that after his 11:52 p.m. phone call with Tyler, he remained in the North Grandview/South Kansas City area for about 1 1/2 hours. Then, during a 1:34 a.m. phone call from Shackelford, Lewis' phone initially pinged off of a tower located at 6111 East 129th Street in Grandview and then pinged off of tower further north at 9801 Bunker Ridge Road. The next time tower information was recorded for Lewis' phone was at 1:59 a.m. when Shackelford called his phone. During this phone call, Lewis' phone first pinged off of a tower located at 15400 Midland Drive in Shawnee and then pinged off of another Shawnee tower located at 12902 Shawnee Mission Parkway. As mentioned above, the tower at 12902 Shawnee Mission Parkway is just east of Tyler's apartment complex and can be seen from the complex. Furthermore, records showed that Eshawn's

29

cell phone pinged off of this tower when he tried calling Tyler's cell phone later that morning. From this evidence, it can be inferred that, at the very least, Lewis was within the vicinity of Tyler's apartment complex and, at the most, Lewis was at the apartment complex.

The forensic evidence discovered on and inside the Escalade tied Lewis to the crimes. As mentioned above, Lewis' right palm print was found on the exterior of the rear driver's side door. His left palm print was found on two different locations on the interior of the Escalade's rear driver's side door frame. His left thumb print was also found on the rear driver's side door frame. Prints of Lewis' left palm and fingers were found on the interior handle of the rear passenger's side door. The placement of the prints on the handle was consistent with Lewis using his left hand to reach across his body to open the rear passenger's side door. Using his left hand to open the rear passenger's side door would indicate that Lewis was holding something in his right hand (*i.e.*, a gun) which prevented him from using that hand—his dominant hand and the one closest to the rear passenger's side door—to open the door. Coincidentally, Tyler's bullet wound and the subsequent blood splatter analysis—showing that Tyler was sitting upright in the front driver's seat when he was shot—indicated that whoever shot Tyler did so while sitting behind him in the backseat and to his right.

Additional blood splatter analysis showed that Tyler, after being shot, remained in an upright position for an indeterminate amount of time. His body was then moved into the position it was found in—lying face down on the front passenger seat with the midsection draped over the center console and the legs extended behind the driver's seat. The detective performing the blood splatter analysis indicated that based on blood transfer stains found on the driver's seat, it was possible that someone else sat in the driver's seat after Tyler's body was moved. Notably, Lewis' DNA was found on the interior manual lock mechanism of the front driver's side door.

Evidence also showed that Tyler was carrying a cell phone and a large amount of cash on the night he was murdered. But neither a cell phone nor cash were found on Tyler or inside the Escalade. In fact, the pockets of Tyler's pants were found turned out as if someone had gone through them, and Tyler's cell phone holder—clipped to the waist of his pants—was found empty. When this evidence is considered in conjunction with: (1) Lewis' finger and palm prints being found in the rear passenger compartment; (2) Lewis' DNA being found on the manual lock mechanism of the front driver's side door; (3) Lewis' late night trip to Shawnee; and (4) Lewis' subsequent trip to California after being contacted by police, it points to Lewis being the person who robbed and shot Tyler. See *State v. Phillips*, 295 Kan. 929, 947, 287 P.3d 245 (2012) ("Evidence of a defendant's flight or attempted flight may be relevant to show both the commission of the acts charged and the intent and purpose for which those acts were committed.").

Admittedly, Lewis denied killing Tyler and stated that after paying Tyler his money, Tyler left in his Escalade. Lewis also provided innocent explanations for (1) why his cell phone pinged off of towers located in the vicinity of Tyler's apartment complex; (2) why his DNA and prints were found inside the Escalade; and (3) why he traveled to California after being contacted by police. Lewis points to this evidence as supporting his argument for why the State did not present sufficient evidence to convict him of the crimes. Essentially, Lewis asks us to engage in a reweighing of the evidence and passing on the credibility of witnesses—things which this court cannot do on appeal. See *McCaslin*, 291 Kan. 697, Syl. ¶ 8.

When the evidence presented at the bench trial is viewed in the light most favorable to the State, it shows that a rational factfinder could have found Lewis guilty of felony murder and aggravated robbery beyond a reasonable doubt. Accordingly, we conclude that the State presented sufficient evidence to convict Lewis of both crimes.

31

Next, Lewis argues that he did not knowingly and voluntarily waive his right to a jury trial. He raised this issue before the district court in his motion for a new trial.

> "Whether a defendant waived the right to a jury trial is a factual question, subject to analysis under a substantial competent evidence standard of review. But when the facts of the district court's determination to accept a jury trial waiver are not disputed, the question whether the defendant voluntarily and knowingly waived the jury trial right is a legal inquiry subject to unlimited appellate review." *State v. Beaman*, 295 Kan. 853, 858, 286 P.3d 876 (2012).

*Applicable Facts*

The parties do not dispute the pertinent facts related to the jury trial waiver. The record on appeal contains a complete transcript of the pretrial motions hearing where Lewis' waiver was discussed. At the hearing, the following exchange took place:

> "THE COURT: The case was set for motions today. I think there is a motion to suppress at least on file. [Defense counsel], I guess I will ask you to start there.
> "[DEFENSE COUNSEL]: Judge, I think just in terms of logistics, the first thing we probably ought to do would be to formally waive our right to jury trial in this case. I have talked with Mr. Lewis on many, many occasions regarding this issue. I know he has counseled with some of his friends and family regarding this as well. For a number of reasons, Judge, which we don't need to annunciate for record purposes, we believe that it is in our best interests and we would ask to be allowed to waive jury trial at this time and ask the trial be had to the Court.
> "THE COURT: Mr. Lewis, obviously you are charged here with a very serious crime for which you could be sentenced to life in prison. You have a right to have your case heard by a jury of your peers. If you waive that right, your case will be heard by a judge. It would be my plan to be here to hear it, but once you waive a jury, you can't get it back later on. Is that what you want to do here?

"THE DEFENDANT:  Yes.

"THE COURT:  Do you have any question about that? Have you had plenty of time to discuss this with Mr. Smith?

"THE DEFENDANT:  Yes. I feel like if I take the jury trial, I won't get a fair trial because it says a jury of your peers, but I don't think it will really be my peers. But in Johnson County with a Johnson County jury, I feel like I won't be treated fairly. I wouldn't be—I wouldn't want to get convicted of a crime I didn't commit.

"THE COURT:  Well, I think I understand your position here, but I want to be clear for the record that you want your case to be heard by a judge rather than a jury. You have a constitutional right to have your case heard and decided by a jury of your peers. Now, we talk about that all of the time, and the fact of the matter is you might not consider the impaneled jury exactly your peers and they might not consider you their peer.

"But if we try this case, we would call in 36 citizens from the county. Your attorney and the State's attorney would have a right to go through and see if any of them had any sort of reason to be against you or especially for you, if any of them felt any bias or prejudice against you. And then even after they went through all of that and we had 36 people, each of these attorneys have a right to release 12 people each. In other words, the State would get to eliminate 12 one by one and your attorney would get to eliminate 12 one by one, and what is left is the jury of 12 that would hear and decide your case.

"And so I just want to be clear that you have a right to have your case heard by a jury of your peers. That is the system we use to assemble that jury. And I just want to make sure that you understand what you're giving up by waiving your right to have your case heard by a jury. Are you comfortable with this?

"THE DEFENDANT:  Yes, I understand. It is pros and cons to the judge. Pros and cons to both sides.

"THE COURT:  Have you had a chance to consider all of that and discuss all this with your attorney?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  That is still what you want to do here?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  All right. I will accept the waiver as knowing and voluntary."

33

In his motion for a new trial, Lewis claimed that he "was denied the opportunity for a fair trial and was denied the opportunity to have a trial to a jury 'of his peers,' requiring the defendant to waive jury trial to avoid facing an all white or virtually all white jury panel." Nowhere in the record does it indicate that Lewis ever requested to change the venue of his trial.

*Analysis*

Lewis argues that the transcript of his waiver and the subsequent argument he made in his motion for a new trial show that his waiver was not voluntary because he believed that as an African-American, he would not face a jury of his peers in Johnson County and, thus, not receive a fair trial. Accordingly, he alleges that he mistakenly believed that the only way to receive a fair trial was to waive his right to a jury trial and proceed with a bench trial. Lewis contends that the district court should have corrected his mistaken belief by informing him that defense counsel could make challenges under *Batson v. Kentucky*, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), during voir dire if it appeared that the State was purposely striking African-Americans from the potential jury.

A criminal defendant may waive the fundamental right to a jury trial if the court and State agree to the waiver. K.S.A. 22-3403 (defendant can submit felony case to court instead of jury with consent); *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 (1975). But this court has said that jury trial waivers should be strictly construed to ensure the defendant has every opportunity to receive a fair and impartial trial by jury. 216 Kan. at 589.

The test for determining a waiver's validity is whether it was voluntarily made by a defendant who knew and understood what he or she was doing. Whether that test is satisfied depends upon the particular facts and circumstances in each case. *Irving*, 216

34

Kan. at 589; see also *State v. Clemons*, 273 Kan. 328, 340, 45 P.3d 384 (2002) (determination of knowing and voluntary jury trial waiver must be based upon facts and circumstances in each case); *State v. Fisher*, 257 Kan. 65, 73-74, 891 P.2d 1065 (1995) (no error in waiver because defendant spoke with counsel prior to decision, was informed of constitutional right to jury trial and effect of bench trial, and showed desire to have bench trial). A waiver will not be presumed from a silent record. *Irving*, 216 Kan. at 589.

In *Irving*, the court cited the American Bar Association's (ABA) standards for accepting a jury trial waiver, which the court adopted as the accepted procedure in Kansas. 216 Kan. at 589-90. Those standards are the same today. See 3 American Bar Association Standards for Criminal Justice, Trial by Jury, Standard 15-1.2(b) (2d ed. 1980). Fashioned from the ABA's recommendation, the *Irving* court stated: "[F]or a criminal defendant to effectively waive his right to a trial by jury, the defendant must first be advised by the court of his right to a jury trial, and he must personally waive this right in writing or in open court for the record." 216 Kan. at 590.

Lewis' contention that his waiver was not knowingly made because the district court judge should have informed him of his attorney's ability to make *Batson* challenges is not supported by our caselaw. In *Beaman*, this court, relying on the standard enunciated in *Irving*, rejected the defendant's argument that his jury trial waiver was not knowingly made because the judge failed to inform him that a 12-person jury would need to unanimously agree in order to convict him. *Beaman*, 295 Kan. at 862; see also *Clemons*, 273 Kan. at 340-41 (same). If that type of general information about jury function does not need to be conveyed to a defendant before he or she can validly waive the right to a jury trial, it does not follow that specific details regarding jury composition via *Batson* be required before a jury trial waiver can be considered knowingly made.

There is no dispute that Lewis' waiver occurred in open court. The only issue is whether that waiver was knowingly and voluntarily made. In the judge's initial statement to Lewis, the judge informed Lewis that he had a right to have his case heard by a jury of his peers and if he waived that right, his case would be decided by the judge. After Lewis indicated that he wanted to waive his right to a jury trial, the judge then asked Lewis if he had any questions. Lewis did not ask any questions but expressed his reason for wanting to proceed with a bench trial: because he felt that a jury comprised of Johnson County residents would not consist of his peers and, thus, would not treat him fairly. Notably, Lewis never explained who he considered to be his peers and, thus, qualified to serve on his jury. Regardless, the judge proceeded to explain to Lewis that he had a constitutional right to have his case decided by a jury of his peers and gave an overview of the system used to assemble 12 impartial jurors to hear his case. After giving this explanation, the judge asked Lewis if he was still comfortable with waiving his right to have his case heard by a jury. Lewis said yes and indicated he was aware that there were "pros and cons" to having his case decided by either a jury or a judge. After indicating to the judge that he had considered his options and discussed the matter with his attorney, Lewis acknowledged that he wanted to waive his right to jury trial and proceed with having his case heard by the judge.

The transcript of the waiver hearing indicates that Lewis knew and understood that he had a right to a jury trial and that he voluntarily waived this right so his case could be decided by the district court judge. Accordingly, we conclude that Lewis' jury trial waiver was valid.

MOTION TO DISMISS

Next, Lewis argues that the district court erred in denying his motion to dismiss the charges against him based on the State's alleged destruction of exculpatory evidence.

"In cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the defendant shows bad faith on the part of the State." *State v. LaMae*, 268 Kan. 544, 550, 998 P.2d 106 (2000). The determination of the question of bad faith turns on the "officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed," and the question of bad faith is a question of fact. 268 Kan. at 551. Accordingly, the district court's factual findings regarding the presence or absence of bad faith are reviewed under a substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review. See *State v. Finley*, 273 Kan. 237, 241, 42 P.3d 723 (2002).

*Applicable Facts*

After law enforcement discovered Tyler's body inside his Escalade on the morning of April 4, 2010, they conducted a search of the Escalade for forensic evidence. After the search was conducted, the Escalade was transported to the Johnson County Crime Lab where a second search for forensic evidence was conducted.

In November 2010, John Stirling, the lead detective assigned to the Tyler murder, spoke with Tyler's brother, Elliott, about the investigation. During their discussion, Elliott mentioned that his brother had a security system installed on the Escalade that could take video footage of the interior of the vehicle. Elliott told Stirling that a car alarm and audio store in Kansas City, Kansas, had installed the system in the Escalade.

Stirling and Mark Phillips, a deputy with the Johnson County Sheriff's Office who works in the criminalistics lab and specializes in video footage, went to the car alarm and audio store. They spoke with a representative of the store about whether the store sold any car alarm systems with video capabilities. The store rep said they did not. The officers looked around the store and noticed a particular system for sale—a ScyTek

VisionGuard—and asked about the system. The store rep told the officers that the system could not store video but had the ability to store 10 still images. The officers asked the store rep whether the store had installed such a system in Tyler's Escalade, but the store rep could not recall ever doing so.

As a result of their visit to the store, in December 2010, the officers, pursuant to a search warrant, searched the Escalade. The officers noticed a small antenna attached to the rearview mirror and a wire coming out of the back of the mirror. It appeared that the wire fed into the rearview mirror. Upon further investigation, however, the officers discovered that the wire did not feed into the mirror but was loose and had the appearance of being pulled out of something. The officers discovered that another wire ran from the antenna and "underneath the headliner, down the A-pillar, and then back behind underneath the dash, and back behind the steering column." After removing the covering underneath the steering column, the officers discovered a black box with the designation "VG8000" on it which contained the electronic components of the security system.

The officers learned that the wire which appeared to feed into the rearview mirror should have fed into a small camera. The officers, however, did not find a camera inside the car. The wire that fed into the camera had a "jagged" look to it, indicating to the officers that the wire had been jerked out of the camera. Attached to the windshield, the officers discovered a mounting bracket that should have held the missing camera.

The officers determined that the system was a ScyTek VisionGuard 8000—the same system they saw at the car alarm and audio store. Phillips contacted the company who manufactured the security system and learned that if the vehicle's battery was allowed to die, any images saved on the system would be lost.

The officers placed a charger on the battery and charged it before starting the car. Once the car was started, it was placed on a tow truck and hauled to the crime lab. Once at the lab, the officers continued to charge the battery and then followed the protocol the engineers from ScyTek described for downloading the images from the system's antenna to a key fob that was on Tyler's key ring (the fob had a 1 inch by half-inch screen which displayed black and white images). The officers determined that there were no images saved on the system.

Prior to trial, Lewis filed a motion to dismiss or, in the alternative, requesting sanctions based on law enforcement's failure to preserve pictures that may have been taken by the security system installed in Tyler's Escalade. Lewis argued that the security system may have taken photos of Tyler's murderer and, thus, could have constituted exculpatory evidence. Notably, in making his argument, Lewis stated:

> "In the present case, while it certainly could be concluded that the officers' lack of timely checking the security system of the vehicle *was ignorance or negligence, rather than bad faith*, that really is irrelevant to the determination of whether the prosecution is irreparably flawed by virtue of allowing the battery to go dead and, therefore, the unavoidable destruction of the strongest piece of evidence that the defendant could hope to receive." (Emphasis added.)

At the motion hearing, Stirling was shown a photo of the Escalade taken on April 4, prior to Tyler's body being removed from the vehicle. The photo depicted the front windshield seen from the perspective of the driver's seat. On the rearview mirror, there can be seen a small antenna that has a wire coming out of it. Stirling testified that without further investigation, the wire appeared to feed directly into the rearview mirror. Upon seeing it, he thought that it was some component of the Escalade's alarm system.

Stirling also stated that at the crime scene, he remembered seeing the mounting bracket attached to the windshield and that he had discussed the bracket with crime scene

personnel. Stirling said that they were not sure what the bracket was at the time they saw it and thought that it may have been a type of windshield sensor for the Escalade's alarm system.

Stirling said that prior to speaking with Tyler's brother, he had no information to indicate that the ScyTek system was even installed in the Escalade. Stirling stated that had he known about the system back in April 2010, he would have attempted at that time to download any photos that might have been saved on the system.

On cross-examination, Stirling said that in April 2010, he had heard of automobile security systems with photographic capabilities. He conceded that the key fob that went with the security system identified it as a ScyTek VisionGuard and that the fob was visible to the investigating officers back on April 4. He also conceded that an investigation of the key fob could have potentially alerted officers to the fact that the security system had photographic capabilities.

Phillips testified that the camera on the ScyTek system was a small 1 inch by 1 inch camera. Phillips believed that the camera did not have flash capabilities for taking photos in darkness. Phillips stated that the camera would record two images within 5 seconds of the car alarm activating. The system would also take a still image if two buttons on the key fob are pressed. The photos are then stored on the system's antenna. If battery power to the vehicle is lost, any images stored on the antenna are lost. Phillips said he spoke to ScyTek engineers who told him that any images saved on the system could only be viewed with the key fob; the images could not be downloaded to a computer. Phillips noted that the security system's camera was never recovered.

Phillips said that unless the alarm system is set off or the camera is operated manually by pushing the two buttons on the key fob, the system would not have taken any photos.

At the conclusion of the hearing, the district court held that even assuming the security system recorded images at the time of the murder, there was no evidence that law enforcement acted in bad faith in failing to preserve those images. Accordingly, the court denied Lewis' motion to dismiss.

*Analysis*

In *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), *reh. denied* 488 U.S. 1051 (1989), the United States Supreme Court stated that while good or bad faith of the State is irrelevant when the State fails to disclose material exculpatory evidence, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a different result when the State fails to preserve evidentiary material "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." The Court stated that it was not willing to read the Due Process Clause as imposing on the police an absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance, and

> "requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." 488 U.S. at 58.

Again, "[i]n cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the defendant shows bad faith on the part of the

41

State." *LaMae*, 268 Kan. at 550. The determination of the question of bad faith turns on the "officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed," and the question of bad faith is a question of fact. 268 Kan. at 551.

Here, there was no evidence presented at the hearing to even suggest that the officers, prior to November 2010, were even aware that the security system in the Escalade had the ability to record images. After Stirling became aware of the possibility, he and Phillips went to great lengths to identify what system was installed in the Escalade. Once they determined that the system could record images, they attempted to preserve any images that may have existed on the system. However, no images were recovered. Based on the evidence presented at the hearing, we conclude that substantial competent evidence supports the district court's finding that the State did not act in bad faith by failing to preserve any images that may have been recorded by the Escalade's security system.

LIFETIME PAROLE

Next, Lewis argues that the district court imposed an illegal sentence by ordering lifetime parole in connection with his aggravated robbery conviction. Under K.S.A. 22-3504, an illegal sentence can be corrected at any time.

In *State v. LaBelle*, 290 Kan. 529, Syl. ¶ 1, 231 P.3d 1065 (2010), this court stated the applicable standard of review:

> "The question of whether a sentence is illegal is a question of law over which this court has unlimited review. An illegal sentence is a sentence imposed by a court without jurisdiction, a sentence which does not conform to the statutory provision, either in character or the term of the punishment authorized, or a sentence which is ambiguous with regard to the time and manner in which it is to be served."

42

As mentioned above, the district court sentenced Lewis to a hard 20 life sentence for the felony-murder conviction and a consecutive 61-month sentence for the aggravated robbery conviction. In announcing Lewis' sentence from the bench, the district court did not impose parole or postrelease supervision in connection to the felony-murder and aggravated robbery convictions, respectively. In the journal entry of judgment, however, the district court imposed lifetime parole for both the felony-murder and aggravated robbery convictions.

As the State concedes in its brief, the district court, pursuant to K.S.A. 2009 Supp. 22-3717(d)(1)(A), should have imposed 36 months of postrelease supervision in connection with the aggravated robbery conviction, a severity level 3 felony. See K.S.A. 21-3427. Consequently, the lifetime parole term imposed in connection with the aggravated robbery conviction does not conform to the applicable statutory provisions and, thus, is an illegal sentence. Accordingly, that portion of Lewis' sentence must be vacated and his case remanded for resentencing so the correct term of postrelease supervision can be imposed in connection with his aggravated robbery conviction.

CUMULATIVE ERROR

Finally, Lewis argues that cumulative error deprived him of a fair trial.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Burns*, 295 Kan. 951, 960, 287 P.3d 261 (2012), *overruled in part on other grounds by State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013). "Cumulative error," however, "will not be found when the record fails to support the errors raised on appeal by the defendant." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

We have concluded that none of the alleged trial errors raised by Lewis on appeal have merit. Consequently, his cumulative error argument must fail.

We affirm Lewis' convictions, but we vacate the lifetime parole term imposed in connection with his aggravated robbery conviction and remand his case for resentencing so the correct term of postrelease supervision can be imposed.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 108,310 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.