NOT DESIGNATED FOR PUBLICATION

No. 120,687

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHELBY PAIGE JUDKINS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed July 31, 2020. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: At the bench trial Shelby P. Judkins requested, she was convicted of aggravated assault and domestic battery. She now appeals her convictions, claiming her jury trial waiver lacked the knowing component for the waiver to be valid because the district court judge did not adequately explain her right to a jury trial before accepting her waiver. Shelby also asserts the evidence was insufficient because the State failed to prove she acted with the required culpable mental states for aggravated assault and domestic battery and the State failed to prove she did not act in self-defense. Finding no error, we affirm.

1

Shelby lived with her mother, Robin Judkins, in an apartment on the second floor. She was charged with criminal threat, domestic battery, and aggravated assault for acts she allegedly committed against Robin on March 30, 2018. At the time, Shelby was 25 years old and almost 9 months pregnant with her first child. Shelby pled not guilty to all counts.

At a pretrial conference held on October 26, 2018, Shelby's counsel informed the district court Shelby wanted to waive her right to a jury trial against his advice and proceed with a bench trial. The State agreed to waive the jury trial, and the district court accepted Shelby's waiver. The district court held Shelby's bench trial three days later with both Robin and Shelby testifying.

*The trial testimony is at odds.*

*Robin's testimony*

Robin testified Shelby seemed upset because the father of her unborn child would not return her phone calls. They sat in Robin's bedroom while Robin tried to comfort her, but Shelby appeared frustrated and eventually went to her own bedroom. Robin stayed in her room watching television. Several hours later, Robin heard a knock on the front door. She went to answer it, but Shelby asked her not to and said it was the police. Ignoring Shelby's request, Robin answered the door to two police officers who informed Robin they had received a "prowler call" from her address but were unable to find anyone outside her apartment. The officers left, and Robin said to Shelby, "What the fuck, Shelby?" or "What the hell, Shelby?" Shelby told her she had seen a man staring at her outside her bedroom window. Robin was frustrated that Shelby had called the police and said Shelby appeared to be having an "episode"—Shelby had been diagnosed with

bipolar disorder and schizophrenia when she was a teenager which often caused her to have hallucinations or paranoia.

Shelby sat down in the living room, and Robin eventually joined her. Shelby kept asking why Robin thought she was lying about seeing a man outside her window. Robin told Shelby she seemed to be having an episode and asked her if she needed help. Shelby started calling Robin different profanities, and, at some point, Robin asked Shelby what would happen if she had one of her episodes after the baby was born. According to Robin, Shelby responded, "I will slit your fucking throat." Robin told Shelby she planned to call the police and went to her bedroom to get her cellphone.

From her bedroom, Robin saw Shelby come out of the kitchen with a long, serrated knife in her hands. Robin tried to shut her bedroom door, but Shelby forced it open with the butt end of the knife. Once inside, Shelby threatened to slit Robin's throat if she did not hang up the phone and then wrestled Robin to the ground. Shelby got Robin on her knees, grabbed the back of her head, held the knife against her throat, and again threatened to slit it. Robin pleaded with Shelby not to hurt her and grabbed Shelby's arm that was holding the knife. Robin told Shelby, "If you let me go, I will let you go," and they both let go of each other. Shelby then hit Robin on the right side of her head with the butt end of the knife, causing Robin to bleed.

Afterwards, Shelby started saying things like, "[W]hen are you going to tell me who you really are?" and "You are not my mom." Robin tried to placate Shelby so she would not attack her again. Shelby threatened to hurt Robin if she left and placed a rocking chair in the doorway of the bedroom to block Robin from leaving. Shelby then sat down in the living room and eventually went to bed. After Robin knew Shelby was asleep, she left the apartment and called 911.

*Shelby's testimony*

Shelby, while raising a self-defense claim, testified that after the police left, Robin accused her of lying about seeing a man outside her window. They started talking in the living room, and, according to Shelby, Robin threatened to have her committed to a mental institution and have her child taken away or adopted.

Robin went into her bedroom, and Shelby grabbed a knife from the kitchen because she was afraid Robin would kick, punch, beat, stab, or shoot her. She testified Robin had a rifle and switchblades in her bedroom. Shelby saw through Robin's opened bedroom door that Robin had something in her hand. At first, Shelby thought Robin was holding a gun, but she later realized it was Robin's cellphone. Robin lunged at Shelby, and Shelby grabbed Robin's cellphone and tossed it aside. Shelby managed to get Robin "down looking at the floor," and she sat on Robin's back. She hit Robin on the head with the butt end of the knife to subdue her. Shelby said she never threatened to slit Robin's throat nor did she hold the knife against Robin's neck.

Shelby said she started asking Robin questions about who she was because she thought Robin was a "clone" and claimed that during their physical altercation, Robin's appearance changed to a man who "looked like who my mother is." About 30 minutes later, Shelby went to her bedroom and fell asleep.

During closing arguments, both parties agreed Shelby's mental health played a role in the case, but defense counsel did not raise a mental disease or defect defense. Instead, defense counsel claimed Shelby's mental health impacted her subjective belief that she needed to and had the right to defend herself against Robin. The State, on the other hand, argued Shelby's actions were inconsistent with a claim of self-defense because the evidence showed Shelby was the first aggressor.

The district court found Shelby guilty of aggravated assault and domestic battery but not guilty of criminal threat. The district court sentenced Shelby to concurrent sentences of 22 months in prison on the aggravated assault count and 6 months in jail on the domestic battery count, both suspended to 24 months' probation.

## I.     THE JURY TRIAL WAIVER WAS SUFFICIENT.

Shelby first argues her jury trial waiver was legally invalid because the district judge failed to properly advise her about her right to a jury trial.

Shelby raises this constitutional issue for the first time on appeal. While Kansas appellate courts generally do not address constitutional issues first raised on appeal, a recognized exception to this rule is when the issue raised affects the person's fundamental rights. *State v. Hirsh*, 310 Kan. 321, 338, 446 P.3d 472 (2019). The Kansas Supreme Court has continually emphasized "the fundamental nature of the right to jury trial." *State v. Redick*, 307 Kan. 797, 802, 414 P.3d 1207 (2018); see *State v. Irving*, 216 Kan. 588, 589, 533 P.2d 1225 (1975). Given that the right to a jury trial is a fundamental right, we will address the merits of Shelby's constitutional argument.

The facts related to Shelby's jury trial waiver are undisputed. The record shows Shelby announced the waiver of her right to a jury trial in open court. Her argument instead centers on a legal question—whether her jury trial waiver was made with adequate understanding of her jury trial right. We exercise unlimited review over this legal question. *State v. Beaman*, 295 Kan. 853, 858, 286 P.3d 876 (2012). In doing this review, "we are mindful that 'jury trial waivers should be strictly construed to ensure the defendant has every opportunity to receive a fair and impartial trial by jury.'" *Redick*, 307 Kan. at 803.

Both the United States and Kansas Constitutions guarantee a criminal defendant's right to a jury trial. U.S. Const. amend. VI; Kan. Const. Bill of Rights, §§ 5, 10. This constitutional right is reflected in K.S.A. 22-3403(1), which requires that all felony cases be tried to a jury unless the defendant and prosecuting attorney, with the consent of the district judge, agree to submit the case to a bench trial. Shelby had a right to a jury trial because she was charged with two felonies: aggravated assault and criminal threat. See K.S.A. 2019 Supp. 21-5412(e)(2) (aggravated assault is severity level 7 person felony); K.S.A. 2019 Supp. 21-5415(c)(1) (criminal threat is severity level 9 person felony).

In *Irving*, the Kansas Supreme Court established a jury trial waiver is legally valid only if "'the defendant, after being advised by the court of his [or her] right to trial by jury, personally waives his [or her] right to trial by jury, either in writing or in open court for the record.'" 216 Kan. at 590. Based on this standard, a district judge must ensure two things take place before he or she consents to a jury trial waiver. First, the judge must present the jury trial as the defendant's *right*—not merely as the defendant's *option* to a bench trial—because a jury trial is a constitutional right while a bench trial is not. Second, if the defendant shows he or she desires to waive the jury trial, then the judge must determine whether the waiver is valid. *State v. Harris*, 311 Kan. ___, 461 P.3d 48, 53 (2020). "The test for determining a waiver's validity is whether it was voluntarily made by a defendant who knew and understood what he or she was doing." *State v. Lewis*, 301 Kan. 349, 376, 344 P.3d 928 (2015).

At the pretrial conference, Shelby waived her right to a jury trial during the following colloquy:

"THE COURT: We're scheduled for pretrial conference this morning. Parties ready for trial on Monday?

"[DEFENSE COUNSEL]: Judge, the defense is ready for trial. [Shelby] is requesting that the State consent to a bench trial to the Court rather than a jury trial.

6

"THE COURT: All right. [Prosecutor]?

"[PROSECUTOR]: Judge, I'm okay with that.

"[DEFENSE COUNSEL]: Just for the record, we have talked about this. We talked about the pros and cons. It is against the advice of counsel, but it is [Shelby's] case. I respect that.

"THE COURT: All right. And you also need to have the consent of the Court. I just want to ask you, [Shelby]: *You understand that you would have a right to have a jury trial in this case*?

"[SHELBY]: I do understand.

"THE COURT: *You have discussed that with your attorney and you're electing to waive your right to have a jury trial and try this to the Court; is that correct*?

"[SHELBY]: Yes.

"THE COURT: All right. Thank you. The Court will accept [Shelby's] waiver of jury trial and we will schedule this for a trial to the Court on Monday." (Emphases added.)

Based on this dialogue, there is no question the district judge explicitly informed Shelby she had the right to a jury trial, and it was not merely an option. Nonetheless, Shelby now asserts, based on her limited conversation with the district court, she did not knowingly waive her jury trial right because the district judge failed to explain to her what her right entailed.

Kansas caselaw does not require a district judge to explain every right associated with a jury trial for a waiver to be knowingly made. See *Lewis*, 301 Kan. at 376-78

7

(holding jury trial waiver valid although district judge did not inform defendant of attorney's ability to make challenges under *Batson v. Kentucky*, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986]); *Beaman*, 295 Kan. at 862 (holding jury trial waiver valid although district judge did not explain 12-person jury would need to unanimously agree on guilt); *State v. Savage*, No. 112,882, 2015 WL 8590269, at *7 (Kan. App. 2015) (unpublished opinion) (holding jury trial waiver valid even though district judge failed to distinguish between jury trial, bench trial, and use of stipulated facts).

On the other hand, some Kansas appellate courts have required a more thorough explanation of what a defendant's jury trial rights entails, two of which Shelby cites in her brief: *State v. Frye*, 294 Kan. 364, 277 P.3d 1091 (2012), and *State v. Cervantes-Cano*, No. 107,179, 2013 WL 1943060 (Kan. App. 2013) (unpublished opinion). Although both *Frye* and *Cervantes-Cano* recognized the district judges failed to explain "the nature and extent" of the defendants' jury trial rights, the facts of both cases are clearly distinguishable from the case before us. See *Frye*, 294 Kan. at 373; *Cervantes-Cano*, 2013 WL 1943060, at *4. In *Frye*, the Kansas Supreme Court considered the district judge's failure to establish the validity of a handwritten waiver, and in *Cervantes-Cano*, a panel of this court addressed an in-court waiver where the defendant had trouble speaking English and relied on an interpreter to communicate with the judge. See *Frye*, 294 Kan. at 373; *Cervantes-Cano*, 2013 WL 1943060, at *4.

More recently, in *Harris*, our Supreme Court found a jury trial waiver was legally insufficient where the district judge framed the defendant's right to a jury trial as a "mere option" and "did not engage in a 'thoughtful exchange' with Harris about the nature of [his] right to jury trial." 461 P.3d at 53. The court noted the parties' discussion with the district judge revolved around confusion about Harris' preference for a jury or bench trial, and once Harris voiced his preference, "the district court simply accepted that Harris wanted to have the court decide the matter and moved on without taking any steps to ensure that Harris understood the right he was giving up." 461 P.3d at 53.

8

Overall, we observe a split in our caselaw on what a district judge must tell a defendant for a waiver to be knowingly made. See *State v. Thomas*, No. 118,082, 2018 WL 3598878, at *4 (Kan. App. 2018) (unpublished opinion). There is no "'checklist'" or guide for district judges to follow when ensuring a defendant's waiver is legally valid. See *Harris*, 461 P.3d at 53; *Beaman*, 295 Kan. at 860-61. Instead, we look to determine whether the waiver was knowingly made based on the facts and circumstances unique to each case. *Irving*, 216 Kan. at 589.

Where appellate courts have found valid waivers despite a district judge's failure to explain every aspect of a defendant's jury trial right, the dialogue between the judge and defendant was generally more thorough than what occurred here. See *Lewis*, 301 Kan. at 377-78; *Beaman*, 295 Kan. at 861; *Savage*, 2015 WL 8590269, at *7. From the record we observe the judge twice informed Shelby of her right to a jury trial after her attorney told the judge Shelby's waiver was against his advice. And to each question presented by the judge, Shelby's response reflected she wanted to waive her right to have a jury trial. The judge's entire dialogue was short and could have been more thorough, but it was sufficient under these facts to advise Shelby she had the right to a jury trial. She was specifically requesting the judge to accept her waiver of that right. Thus, the record demonstrates the judge performed his duty "to inform a defendant of his or her jury trial right." *Frye*, 294 Kan. at 371.

II.   NO CULPABLE MENTAL STATE IS REQUIRED FOR THE IDENTITY OF THE PERSON HARMED.

Shelby next argues insufficient evidence supports the district court's findings she acted with the required culpable mental states for domestic battery and aggravated assault. She points to trial testimony suggesting she was unaware "Robin was Robin" on the night of the incident and claims the State was required to prove she committed the criminal acts with Robin's identity in mind. In response, the State argues neither domestic

9

battery nor aggravated assault require a mental culpability for the identity of the person harmed and, therefore, Shelby's insufficiency of the evidence argument fails. The State's argument is persuasive.

Shelby's argument is similar to a mental disease or defect defense. K.S.A. 2019 Supp. 21-5209 allows a defendant to put on evidence that he or she was unable to form the culpable mental state required for an element of the crime charged. At trial, both Robin and Shelby testified Shelby had been diagnosed with bipolar disorder and schizophrenia. But having a mental disease or defect is not a defense in itself; its application is limited to the definition under K.S.A. 2019 Supp. 21-5209. Defense counsel did not raise a mental disease or defect defense at trial and, instead, relied on a theory of self-defense. Thus, Shelby's attempt to raise a form of a mental disease or defect defense on appeal is without support.

More importantly, Shelby's underlying argument deals with a question of statutory interpretation, not sufficiency of the evidence. Whether the statutes defining domestic battery and aggravated assault require a defendant to commit the acts constituting the crime with the victim's identity in mind is a legal question subject to an unlimited standard of review. See *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). The goal of statutory interpretation is to determine the Legislature's intent based on the language it used. When a statute's text is plain and unambiguous, Kansas appellate courts interpret the language as written, giving common words their common meanings. *Nauheim v. City of Topeka,* 309 Kan. 145, 149, 432 P.3d 647 (2019). Because Shelby's underlying argument fails under the plain language of the statutes defining these crimes, her sufficiency of the evidence claim inevitably fails. Evidence cannot be insufficient where no evidence is required.

Shelby was convicted of domestic battery, which is defined as "[k]nowingly or recklessly causing bodily harm to a person with whom the offender is . . . a family or

10

household member." See K.S.A. 2019 Supp. 21-5414(a)(1). "Family or household member" includes "persons 18 years of age or older who are . . . parents or . . . children." K.S.A. 2019 Supp. 21-5414(e)(2). Shelby does not argue the State failed to prove she and Robin were "family or household" members as the term is defined in K.S.A. 2019 Supp. 21-5414(e)(2). Instead, she argues domestic battery requires a distinct mental state for the identity of the person battered.

K.S.A. 2019 Supp. 21-5202 governs mental culpability. Its provisions relevant to Shelby's argument provide:

> "(a) Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'

> . . . .

> "(f) If the definition of a crime prescribes a culpable mental state that is sufficient for the commission of a crime, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the crime, unless a contrary purpose plainly appears.

> "(g) If the definition of a crime prescribes a culpable mental state with regard to a particular element or elements of that crime, the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided."

"K.S.A. 2016 Supp. 21-5202(a) provides that a culpable mental state is an essential element of every crime. It does not mandate, however, that a culpable mental state is an essential element of every element of every crime." *State v. Collins*, No. 114,720, 2017 WL 840199, at *6 (Kan. App. 2017) (unpublished opinion). Domestic

11

battery prescribes two culpable mental states—knowingly or recklessly. But these culpable mental states only apply to one element of the crime—causing bodily harm "to a person." K.S.A. 2019 Supp. 21-5414(a)(1). The required relational nexus between the defendant and victim as "household or family members" is a separate element of domestic battery. See *State v. Carter*, 54 Kan. App. 2d 34, 42, 395 P.3d 458, *rev. denied* 307 Kan. 989 (2017). This element is a stand-alone fact and does not require a culpable state of mind.

Thus, Shelby's argument ignores K.S.A. 2019 Supp. 21-5202(g): If a crime prescribes a culpable mental state for one element, "the prescribed culpable mental state shall be required only as to specified element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided." Subsection (g) applies to domestic battery, and its more specific provisions control over the more general provisions under subsection (a). Because the State was not required to prove Shelby committed domestic battery with her mother's identity in mind, her sufficiency of the evidence argument fails.

Shelby makes the same argument for her aggravated assault conviction. Shelby was convicted of assault with a deadly weapon. See K.S.A 2019 Supp. 21-5412(a), (b)(1). Her argument is even less persuasive for her aggravated assault conviction because none of the crime's elements require a relational nexus between a defendant and victim. The State was merely required to prove Shelby knowingly placed "another person" in reasonable apprehension of immediate bodily harm; it did not have to prove Shelby acted with her mother's identity in mind. See K.S.A 2019 Supp. 21-5412(a).

III.    WHEN THE DEFENDANT IS THE AGGRESSOR, A SELF-DEFENSE THEORY IS NOT AVAILABLE.

As her final argument, Shelby argues insufficient evidence supports her convictions because the State failed to prove she did not act in self-defense.

When a defendant challenges the sufficiency of the evidence in a criminal case, we determine whether the evidence, when reviewed in the light most favorable to the State, was sufficient for a rational fact-finder to conclude the defendant was guilty beyond a reasonable doubt. In doing so, we "'do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). It is only in rare cases when the testimony is "so incredulous no reasonable fact-finder could find guilt beyond a reasonable doubt" that a guilty verdict will be reversed. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

K.S.A. 2019 Supp. 21-5222 governs self-defense. A person is justified in the use of nondeadly force against another "when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 2019 Supp. 21-5222(a). But these provisions generally do not apply when the person is the initial aggressor. See K.S.A. 2019 Supp. 21-5226.

Overall, Robin and Shelby's testimony reflected polar opposite testimony of the night's activities. Robin testified for the State that Shelby forced open her bedroom door with the butt end of the knife, wrestled her to the ground, held the knife against her throat, and eventually hit her on the head with the butt end of the knife, causing her to bleed. In support of her defense, Shelby claimed she walked through Robin's opened bedroom door—with the knife already in her hands—and wrestled Robin to the ground

13

because Robin lunged towards her. Shelby denied holding the knife against Robin's throat and testified she hit Robin on the head with the butt end of the knife to subdue her.

We review this evidence in the light most favorable to the State, not in the light most favorable to Shelby's self-defense theory. In doing so, a rational fact-finder could have found Shelby's actions were inconsistent with a claim of self-defense and she was guilty of aggravated assault and domestic battery beyond a reasonable doubt. The State presented evidence showing Shelby was the initial aggressor and placed Robin in reasonable apprehension of imminent bodily harm by holding the knife to her throat and, in fact, did cause Robin bodily harm when she hit her with the butt end of the knife. To find the evidence insufficient, we would have to reweigh the credibility of the witnesses—a task not within our limited scope of review. See *Chandler*, 307 Kan. at 668.

Affirmed.