NOT DESIGNATED FOR PUBLICATION

No. 128,629

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMBER M. PEERY,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; JESSICA HEINEN, judge. Oral argument held November 18, 2025. Opinion filed February 6, 2026. Affirmed.

*Sheena Foye*, of Wyrsch Hobbs Mirakian PC, of Kansas City, Missouri, for appellant.

*Carolyn A. Smith*, assistant deputy district attorney, *Michael Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., HILL and JOAN LOWDON, District Judge, assigned.

PER CURIAM: Amber M. Peery appeals her convictions for three counts of reckless involuntary manslaughter and two counts of reckless aggravated battery. These convictions resulted from a tragic wreck that caused the deaths of three girls and injured two others in Peery's vehicle. Peery raises four arguments on appeal, but we find no error and affirm her convictions.

FACTS

*Before the Collision*

Around 8 a.m. on October 8, 2022, members of Girl Scout Troop 5567 met in a grocery store parking lot on the west side of Topeka to carpool to Tonganoxie for a Girl Scout event. Three adults were driving the girls to the event—Margaret Jones (the troop leader), Amelia Bailey (Jones' daughter and a troop parent volunteer), and Amber Peery (a troop parent volunteer and the defendant). Jones had no children in her vehicle. Bailey had five girls in her minivan. Peery also had five girls in her minivan—her two daughters, C.P. and B.P., and three other Girl Scouts, L.E., K.L., and G.P.

The three vehicles began their caravan with Jones leading them onto the highway toward the entrance to the Kansas Turnpike. Peery's vehicle was the third in the caravan. But rather than take the ramp to head east towards Tonganoxie via I-70, Jones mistakenly headed towards the entrance to I-335, toward Emporia. Jones realized her error and stopped before the entrance to I-335, but she was too far down the ramp to correct her error. Bailey stopped behind her, but Peery kept driving and got on I-335, putting her ahead of Jones and Bailey.

Jones estimated that her navigational error would result in about an hour's delay because they would have to drive to the first exit about 30 miles away, turn around, and come back to get on the correct highway. Unable to take the correct exit, Jones reentered the roadway and took I-335 toward Emporia. Bailey followed.

Jones called Peery and Bailey and apologized for taking the wrong exit. She testified that she called Bailey first and told her they needed to go to the next exit to turn around, but Bailey disagreed. Instead, Bailey planned to "make a U-turn at one of the

non-U-turn intersections." To the contrary, Bailey testified that making a U-turn on the highway was not her idea, but Jones'.

Jones then called Peery and told her what Bailey was planning to do and discussed options with Peery. Jones told Peery she was going to stay with Bailey and make a U-turn because Bailey was her daughter. Peery asked, "[Y]ou know you're asking me to do something illegal?" And Jones responded: "I know. . . . [B]ut I'm not asking you. . . . [Y]ou have to make—everyone has to make a decision for themselves and that we should go on—if she had any qualms, she should go on to Overbrook to the bypass[] and come back."

Jones testified that Peery's hesitancy to make a U-turn made her second guess the U-turn plan, so she tried to call Peery back to tell her to just turn around at the first exit, but Peery did not answer. Jones then called Bailey to tell her she should not make the U-turn because it was not safe and "she had my granddaughter in the car," but, according to Jones, Bailey kept assuring Jones that it was safe to do so. Jones was getting frustrated by talking on the phone while driving and it diverted her focus, so she pulled over on the shoulder and Bailey pulled over behind her.

Jones got out of her vehicle and told Bailey again that they should just continue ahead and turn around at the first exit, but Bailey responded that Peery would already be headed back northbound so they should make the U-turn and wait for her. Bailey and Jones then illegally made U-turns in a break in the concrete barriers that divided the two southbound lanes from the two northbound lanes of the highway. After Jones and Bailey performed their respective U-turns, they pulled over onto the shoulder of the highway to wait for Peery, who was southbound.

Peery then called Bailey to ask where they were, and Bailey told her that she and Jones had turned around. Bailey testified that Peery told her she planned to find

somewhere to turn around also. After some time passed, Peery called again and told Bailey that her vehicle had been hit by a semi-truck.

*The Collision and Its Immediate Aftermath*

After being told that Bailey and Jones had made U-turns and were waiting for her to rejoin the caravan, Peery, who had not pulled over, started to make a U-turn at a break in the concrete barriers on I-335. To execute the U-turn, Peery began to slow her vehicle in the outside right lane. She engaged her brakes and her brake lights illuminated, she activated her left turn signal, and then she swung a bit right to begin to turn from the outside right lane across the inside left lane toward the break in the barriers to complete her U-turn. But before she could complete her U-turn her van was struck by a semi-truck driven by Robert Russell.

Russell was unable to testify at trial due to illness, but his testimony from the preliminary hearing and his deposition were read to the jury. He testified that he was driving in the right lane headed southbound on I-335 when he first noticed Peery's van on the side of the road. He saw her pull from the shoulder into the same lane he was in and "was moving [at a] pretty decent speed." Her van then inexplicably slowed down and veered toward the right shoulder. So, to navigate around her and give her space, he moved from the right to the left lane of traffic. Just moments before Russell would have passed Peery, her van suddenly made a hard-left turn into his lane directly into the path of Russell's semi-truck. He braked, but the two vehicles collided.

Russell's semi-truck was equipped with video technology that recorded events before and during the collision. It shows Peery's vehicle in the right lane slowing, braking, and signaling left. Russell's semi-truck then moves from the right lane to the left lane to pass Peery's vehicle. The semi-truck crashed into the driver's side of Peery's van toward the rear of the van before Peery could complete her U-turn.

4

Ben Fenoglio was also driving southbound on I-335 with his family and was approximately 500 feet behind Russell's semi-truck. He saw the semi-truck switch lanes from the right to the left, and Fenoglio followed suit. After he switched lanes, he saw Peery's van in the right lane, approximately 50 feet from the semi-truck. He then saw Peery's van turn left in front of the semi-truck and then saw smoke and debris as he moved his vehicle to the right side of the roadway and pulled over. He exited his vehicle, waved at other vehicles to slow down, and then scouted the area for injured people while his wife called for help.

The wreck killed three of the girls at the scene—L.E., K.L., and B.P. Two were ejected from the van. B.P. landed on the southbound roadway and L.E. landed on the grass beside the northbound side of the highway. K.L. was found deceased in the van.

Autopsies were performed on the three girls. The medical examiner who performed them testified to the results and discussed the girls' injuries, which included identifying the most significant injury that contributed to each of their deaths. C.P. and G.P. were injured but survived. C.P. was trapped inside the van, and law enforcement had to pry the door open to get her out of the van. She suffered a broken femur, which required surgery. G.P. was transported to the hospital for concussive-type symptoms; her injuries were "[v]ery minor," but she was admitted overnight for observation.

Immediately after the collision, Peery called Bailey and informed her she had been hit by a semi-truck. Bailey approached Jones and told her there was an accident "and the girls [were] not okay." Bailey continued traveling to the Girl Scout event with the five girls in her van, while Jones went to the scene of the wreck.

When Peery saw Jones at the scene, Peery started shouting at Jones: "[W]hy did you tell me to do this? Why did you tell me to do this?" A law enforcement officer then stepped between the two.

5

Law enforcement at the scene indicated that neither Peery nor Russell showed signs of being impaired, yet both drivers were distressed. Peery wanted to lie by her deceased daughter who had been ejected from the van. Russell was "stating over and over, why did she do that? I didn't think she was going to do that."

Peery was taken to the hospital where she gave a voluntary witness statement to police officers about what happened. In her statement, Peery said she had been told when on speakerphone with the other drivers to make a U-turn through the concrete barriers. She stated she was in the right lane when she tried to make the U-turn, and that she knew the semi-truck was behind her. Peery did not testify at trial, but her written statement was admitted.

Russell's semi-truck was inspected on the day of the wreck for possible contributors to the wreck. The inspection report admitted at trial showed that 3 of 10 brakes on the semi-truck were "beyond the adjustment limit," indicating a level of wear or misalignment beyond desired standards. Brakes beyond the adjustment limit should take a semi-truck offline until fixed. In any event, the brakes were still operable and applied force to slow the vehicle, but not as much force as the manufacturer had designed them to apply. In the end, no mechanical defects were found to have contributed to the wreck.

During the investigation, law enforcement downloaded data from the airbag control module in Peery's van. The module collects data from approximately five seconds before the impact that causes the airbags to deploy. This data showed that five seconds before impact, Peery's vehicle was traveling 55 miles per hour and at the moment of impact it was traveling 12 miles per hour. The data from Russell's semi-truck indicated that he was traveling at 69 miles per hour just before the collision. The speed limit was 75 miles per hour.

*The Legal Proceedings Against Peery*

In June 2023, the State charged Peery with two counts of reckless involuntary manslaughter under K.S.A. 21-5405(a)(1), for the deaths of L.E. and K.L.; one count of making a U-turn on the interstate under K.S.A. 8-1524(b); and one count of failure to maintain a lane under K.S.A. 8-1522(a). In November 2023, the State amended the charges against Peery to include a third count of reckless involuntary manslaughter under K.S.A. 21-5405(a)(1) for the death of B.P. (Peery's daughter), one count of reckless aggravated battery under K.S.A. 21-5413(b)(2)(B) for G.P.'s injuries, and one count of reckless aggravated battery under K.S.A. 21-5413(b)(2)(A) for C.P.'s injuries.

At Peery's preliminary hearing, Russell testified that his vehicle was equipped with a video camera that recorded externally and another camera that could record the inside of the cab to reveal what the driver is doing. But he did not know if the internal video camera was recording on the day of the wreck and he could not control that camera— only the trucking company could turn it on. A law enforcement officer testified that he had received a 92-second external video recording from the trucking company Russell was driving for and did not issue a subpoena for additional video footage from the company. Thus no internal video footage was provided.

After the preliminary hearing, the State contacted the officers involved in the investigation and asked them to search for any additional video from the semi-truck taken during the collision. That inquiry was unsuccessful. Eventually, the State learned that the officers had received no response from the trucking company to their inquiries about additional video footage. The State told the district court and the defense that if any new evidence were found, it would be provided as soon as it was obtained.

Before trial, Peery moved in limine to exclude 13 of the State's Exhibits. These were 3 photos of the deceased girls at the scene and 10 external autopsy photos which the

7

medical examiner used to describe his findings. Peery argued that the photos were unduly prejudicial and had little to no probative value other than to inflame the jury's passions. The State countered that the proposed exhibits were probative because they showed where each deceased child was found at the scene and they corroborated the witnesses' testimony. It added that although Peery could stipulate to the cause of death and severity of the injuries, the State need not accept that stipulation and the State bears the burden at trial to establish the cause and manner of death. After viewing the photos, the district court found their probative value outweighed their prejudicial effect and thus denied Peery's motion, finding the photographs admissible.

At Peery's jury trial in August 2024, neither Peery nor Russell testified. Jones and Bailey both testified that they had made U-turns through a break in the concrete barriers on I-335 and that they had told Peery so before she attempted her U-turn. A law enforcement officer testified that U-turns between concrete barriers on I-335 were illegal, yet not unusual.

As for the video from the trucking company, law enforcement testified that it had followed up with the trucking company after the preliminary hearing and had been told that there was no internal camera in the semi-truck. It believed it had received all available videos from the trucking company.

Timothy Hutchings, the vice president of safety and compliance for the trucking company, testified that the company's semi-trucks have the capability to record externally and internally. Videos are retained for six days. The company used its judgment to decide what portion of the video to send to law enforcement and sent a 92-second clip of a longer video that had been retained for 6 days after the accident.

Hutchings testified that the internal cab camera is activated and records only if the company receives notice that the driver failed to maintain a lane or left the roadway.

When the trucking company gets such notice, it monitors the external camera footage to look for a reason for the nonstandard driving. If the company sees nothing in the roadway, then it knows "something has to be going on with the driver," so it activates the internal camera and begins recording. Yet here, at the time of the collision, the internal camera was never activated so no internal video recording existed.

James Bray, an accident reconstruction expert for the defense, reviewed the data from Peery's and Russell's vehicles. He testified that Russell's semi-truck was on cruise control set at 69 miles per hour at least three seconds before impact. The speed limit at the place of the collision was 75 miles per hour. As for the data from Peery's vehicle, Bray had only five seconds of data to review because her vehicle only had the capability to record five seconds before the airbags were activated. Bray determined that Peery had illuminated her brake lights, was decreasing her vehicle's speed, and had turned on her left-turn signal. Bray opined that if Russell had not moved to the right lane to pass Peery's vehicle, the collision would not have occurred. He also opined that earlier braking by Russell could have possibly avoided the collision or greatly reduced the speed at which the semi-truck impacted Peery's minivan.

The jury found Peery guilty as charged on all seven counts—three counts of reckless involuntary manslaughter, two counts of reckless aggravated battery, one count of making a U-turn on the interstate, and one count of failing to maintain a lane.

Peery moved for a judgment of acquittal, arguing that the State had failed to prove beyond a reasonable doubt that she was the proximate cause without any intervening cause of the girls' deaths and that her actions were a gross deviation from a reasonable person's standard of care (reckless). Peery also moved for a new trial, reasserting her pretrial arguments about admitting "gruesome" photographs and the lack of sufficient evidence. She added that a new trial was necessary because the State had failed to

properly preserve all the video footage from the semi-truck. The district court denied both motions.

At sentencing, Peery supplemented her motion about the State's failure to preserve all the video footage from the trucking company by submitting a "new" 20-second video. This video showed the same vantage point, as did the previously produced 92-second video, but its data showed the time of day and the semi-truck's speed.

As her sentence, Peery requested probation and treatment under the border box criteria. The district court denied that motion. In explaining why it was sentencing her to prison, the district court detailed her extreme recklessness and her lack of acceptance of responsibility for her acts:

> "In this case, the presumed sentence set out by the Kansas Legislature is imprisonment. However, the Court can impose a non-prison sentence if an appropriate treatment program exists which is likely to be more effective than the presumptive prison term in reducing offender recidivism and that program is immediately available, which is what you have put forth through your attorney here today, and at a prior hearing. However, what seems most obvious to the Court is if there's a treatment program available that would likely be effective in reducing any recidivism, you would first, at the very least, have to acknowledge that there is a behavior to correct in accepting responsibility for your actions. This Court has heard evidence that you, at times, have not, or did not acknowledge your reckless actions. And make no mistake about it, your reckless actions of slowing down to 12 miles per hour on an interstate in a matter of seconds knowing that there is a semi[-truck] right behind you in the right lane, and then attempting to cross another lane of traffic, to then make a [U]-turn through a small concrete barrier on an interstate to then cross over into other oncoming traffic knowing that you have five children you're caring for, that is extremely reckless in this Court's view. The collision was completely []avoidable and your reckless actions took the lives of three children and hurt two others."

10

The district court sentenced Peery to a controlling term of 64 months in prison.

Peery does not appeal her sentence or her convictions for making a U-turn on the interstate or failing to maintain a lane. She timely appeals her convictions for three counts of reckless involuntary manslaughter and two counts of reckless aggravated battery.

ANALYSIS

Peery raises four arguments challenging these convictions.

1. The district court abused its discretion by admitting photographs of the deceased girls at the collision scene and their autopsies because the photos were unduly prejudicial;

2. The State violated her due process rights of fundamental fairness and her ability to have a meaningful opportunity to present a complete defense under the Fourteenth Amendment to the United States Constitution by failing to preserve all video footage from the semi-truck;

3. Insufficient evidence supports these convictions because the State did not prove beyond a reasonable doubt that Peery, rather than an intervening act, proximately caused the girls' deaths and injuries; and

4. Insufficient evidence supports these convictions because the State did not prove beyond a reasonable doubt that Peery's conduct was reckless—a gross deviation from the standard of care a reasonable person would use in the same situation.

I.      *Did the district court abuse its discretion by admitting photographs from the wreck scene and the autopsies of the deceased children?*

Peery first argues that the district court abused its discretion by admitting photos of the deceased girls at the collision scene and their autopsies because the photos were unduly prejudicial. She argues admission of the written autopsy reports plus the testimony of the medical examiner and the video of the collision were more than enough to show that the girls died from injuries they sustained in the wreck, and the photos were unduly prejudicial and had minimal, if any, probative value. She asserts that the gruesome photos were not necessary to help explain the injuries or cause of deaths but were used to inflame the passions of the jury.

*Standard of Review*

When reviewing the admission of photographic evidence, the threshold issue is whether the evidence is relevant. "If so, the decision to admit the photographs over a challenging party's objection that they are overly repetitious, gruesome, or inflammatory, i.e., unduly prejudicial, is reviewed for an abuse of discretion." *State v. Williams*, 308 Kan. 1320, 1333, 429 P.3d 201 (2018).

A district court judge commits an abuse of discretion by (1) adopting a ruling no reasonable person would make, (2) making a legal error or reaching an erroneous legal conclusion, or (3) reaching a factual finding not supported by substantial competent evidence. *State v. James*, 309 Kan. 1280, 1305-06, 443 P.3d 1063 (2019). Peery, as the party asserting the error, bears the burden in showing an abuse of discretion. *Williams*, 308 Kan. at 1333. If Peery establishes error, the State must then persuade this court that there is no reasonable probability that the error affected the outcome of the trial given the entire record before the court. *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018).

*The district court did not abuse its discretion by admitting the crime scene and autopsy photographs.*

Peery challenges the admission of State's Exhibits 32, 33, 34, 41, 42, 43, 44, 46, 47, 49, 50, 51, and 52. Photos 32, 33, and 34 were photographs of B.P., L.E., and K.L. at the scene of the wreck. The remaining 10 photos were external autopsy photos of the girls. Peery does not argue that admission of the photos was an error of law or fact. She argues only that their admission was unreasonable because "the only reasonable conclusion for the admission of these photos was to inflame the jury and unduly prejudice" Peery at trial.

"Photographic evidence is relevant and generally admissible if it has a reasonable tendency to prove a material fact in the case." *Williams*, 308 Kan. at 1333; see K.S.A. 60-401(b). The district court held that the challenged photos from the scene of the collision were relevant because the photos would corroborate witness testimony regarding the location of the children and eyewitness observations as well as the cause and manner of the deaths to help prove Peery's reckless conduct. As for the autopsy photos, the district court held they were relevant and probative to establish the identity of the victims, provide context for the cause of death, and help the jury understand the medical examiner and forensic pathologist's testimony about the autopsy. Peery concedes the challenged photographs were relevant, and we agree.

Yet even if evidence is relevant, the district court may still exclude the evidence if it presents a risk of undue prejudice that substantially outweighs its probative value. *State v. Seba*, 305 Kan. 185, 213, 380 P.3d 209 (2016). Peery labels the photos as gruesome, but even gruesome photographs are not automatically inadmissible. "Gruesome crimes result in gruesome photographs." *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002) (holding photographs of murder victim's injuries were not unduly prejudicial although they caused a juror to faint); *State v. Rodriguez*, 295 Kan. 1146, 1157, 289 P.3d 85 (2012)

13

(probative value of gruesome internal photographs of deceased five-month-old victim was probative and not unduly prejudicial because they showed extent of injuries). Instead, a district court errs "by admitting gruesome photographs that serve *only* to inflame the jury." (Emphasis added.) *State v. Alfaro-Valleda*, 314 Kan. 526, 535, 502 P.3d 66 (2022).

The district court reviewed the challenged collision scene photos and determined that their probative value outweighed any prejudice, holding:

> "The State narrowed down the numerous possible photographs to only one photograph of each deceased child's final location at the scene. While the Court acknowledges that these photographs are difficult to look at given the extent of injuries and age of the children, 'gruesome crimes result in gruesome photographs.' *State v. Alfaro-Valleda*, 314 Kan. 526, 535, 502 P.3d 66 (2022). The Court finds that these three exhibits are not being presented *only* to inflame the passions of the jury. Therefore, Exhibits 32 – 34 are admissible."

Similarly, the district court reviewed the autopsy photos and held that their probative value was not substantially outweighed by the danger of undue prejudice:

> "Again, although these photographs are hard to look at that does not make them automatically inadmissible.
>
> "These photographs will help tie up loose ends of witnesses' testimony as well as educate and assist the jury in determining the cause and manner of death of each child. Each photograph serves a purpose other than to inflame the jury. See *State v. Lowry*, 17 Kan. 89, 524 P.3d 416 (2023) (photographs showing injuries and manner of death were not presented only to inflame passions of the jury and were more probative than prejudicial.); See also *State v. Rodriguez*, 295 Kan. 1146, 289 P.3d 85 (2021) (probative value of gruesome photographs of deceased five-month old victim was probative and not unduly prejudicial in that it showed extent of injuries.) Therefore, exhibits 41 – 44, 46 – 47, and 49 – 52 are admissible."

Peery argues that because her crimes were not alleged to be intentional but merely reckless, the State had no need to admit any photos of the scene—it was undisputed that the children's deaths were caused by the wreck, and the cause of death could be proven through other evidence. She argues that showing deceased children on the roadway and in autopsy photos did not help the jury determine whether Peery's acts were reckless.

But the State bears the burden of proving every element of the charged crimes, and photographs that depict the manner of death and nature of the crime are relevant, even when the cause of death is not in dispute. *James*, 309 Kan. at 1306; see also *State v. Randle*, 311 Kan. 468, 479, 462 P.3d 624 (2020). Further, "[t]he State also has an interest in presenting its case in its own way by telling the story as the State wishes." *State v. Lee*, 266 Kan. 804, 815, 977 P.2d 263 (1999); see also *State v. Pollard*, 306 Kan. 823, 839, 397 P.3d 1167 (2017) (holding "the relevance of a particular form of evidence is generally not 'affected by the availability of alternative proofs of the element to which it went'"). So just because other evidence was available and the mens rea was recklessness, does not necessarily mean that the admitted photographs were unduly prejudicial.

Still, the admission of gruesome photos can be an abuse of discretion and cause undue prejudice. "Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, and add nothing to the State's case." *State v. Hickles*, 261 Kan. 74, 85, 929 P.2d 141 (1996). Admitting gruesome photographs simply to "inflame the minds of the members of the jury" is error. *Rodriguez*, 295 Kan. at 1157. As for autopsy photographs, "'great care must be taken so that the pictures do not simply shock and revolt, but rather help the jury understand the medical testimony.'" *State v. Adam*, 257 Kan. 693, 707, 896 P.2d 1022 (1995).

Peery likens this case to two cases in which the Kansas Supreme Court found an abuse of discretion in admitting internal autopsy photographs—*Adam*, 257 Kan. at 707-08, and *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975). In *Adam*, the court

15

held that the district court abused its discretion by admitting internal autopsy photographs that were "extremely gruesome and repulsive" and whose probative value was minimal or none. 257 Kan. at 708. Similarly, in *Boyd*, 216 Kan. at 377-78, our Supreme Court found an abuse of discretion by admitting internal autopsy photos, one of which showed "the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant." 216 Kan. at 378.

But *Adam* and *Boyd* involved internal autopsy photos that were particularly graphic. In contrast, the autopsy photos here were external images only. In each photo the State had redacted the girls' eyes. And none of the photos were particularly graphic. The State did not offer numerous autopsy photos but only those that corresponded to and aided the medical examiner's testimony. Similarly, although there were many photos of the scene, the State offered only one image of each victim. Those photos were taken from a few feet away and did not show injuries close up. And the State did not seek to admit any body cam footage from the responding officers, thus limiting the jury's exposure to the scene and preventing its repeated viewing of the victims.

True, the photos depict the result of the wreck and are unpleasant to view because of the context and the young ages of the victims. That said, these photos are not gruesome, shocking, or revolting, and they accurately reflect the tragic end result of the events that day. The State and district court took care to minimize the potential inflammatory effect while permitting the State to prove the extent of the girls' injuries and meet its burden to prove all elements beyond a reasonable doubt. The district court thus did not abuse its discretion by holding that the selected photos were not meant to inflame the jury but were, instead, used to aid the State in proving its case. Peery has failed to show that *no* reasonable person would have admitted these photographs.

16

II.     *Did the State violate Peery's due process rights by failing to obtain and preserve all the video footage from the semi-truck that struck Peery's minivan?*

Next, Peery argues that the State acted in bad faith by failing to obtain and preserve all the video footage from the semi-truck. She claims this violated her due process right to fundamental fairness and her ability to have a meaningful opportunity to present a complete defense under the Fourteenth Amendment to the United States Constitution. She asserts that any video of the events from the semi-truck, external or internal, that captured what happened before the collision is relevant to the credibility of the semi-truck driver, and that law enforcement's failure to subpoena and preserve all video evidence from the semi-truck company was an act of bad faith. Peery also contends that law enforcement unreasonably relied on the trucking company to provide all video evidence even though the trucking company was biased due to its exposure to liability from the wreck. She also argues that the district court's ruling on this issue is not supported by competent evidence.

Our standard of review of this issue is well established:

> "In cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the defendant shows bad faith on the part of the State. The determination of the question of bad faith turns on the officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed, and the question of bad faith is a question of fact. Accordingly, the district court's factual findings regarding the presence or absence of bad faith are reviewed under a substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review."
> *State v. Lewis*, 301 Kan. 349, Syl. ¶ 6, 344 P.3d 928 (2015).

Substantial competent evidence is legal and relevant evidence that a reasonable person might regard as sufficient to support a conclusion. *State v. Rinke*, 313 Kan. 888, 892, 491 P.3d 1260 (2021).

17

*The State did not violate Peery's due process rights by failing to obtain and preserve all the video footage from the semi-truck that struck Peery's minivan.*

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires fundamental fairness. *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984). This fairness includes a criminal defendant's right to have a meaningful opportunity to present a complete defense. *State v. Pichon*, 15 Kan. App. 2d 527, 530, 811 P.2d 517 (1991). Fundamental fairness thus requires the State to deliver to the accused any exculpatory evidence in its possession. *Brady v. Maryland*, 373 U.S. 83, 89-91, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see also *State v. Carmichael*, 240 Kan. 149, 153, 727 P.2d 918 (1986). Yet "[l]ess clear from our access-to-evidence cases is the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession." *Trombetta*, 467 U.S. at 486.

The Due Process Clause and fundamental fairness do not impose an absolute duty on law enforcement to preserve all material that might contain evidentiary significance in any given case. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). Nor does the Due Process Clause require law enforcement to use any particular investigatory tool. 488 U.S. at 58-59. The duty of the government to preserve evidence under the Constitution is limited to evidence expected to play a significant role in the defendant's case. *Trombetta*, 467 U.S. at 488. When the claim is, as here, that the State violated due process by failing to preserve "potentially useful evidence," it is up to the defendant to show that the State or law enforcement acted in bad faith. *State v. Johnson*, 297 Kan. 210, 217-18, 301 P.3d 287 (2013); see also *Youngblood*, 488 U.S. at 58. This determination of bad faith "turns on the 'officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *Johnson*, 297 Kan. at 218 (quoting *State v. LaMae*, 268 Kan. 544, 551, 998 P.2d 106 [2000]). The question of bad faith is a question of fact. 297 Kan. at 218.

18

Peery argues that the internal and external video evidence from the semi-truck's camera would have shown that Russell was clearly distracted, and likely confused Peery's van with Bailey's van, which Russell had passed earlier, parked on the shoulder.

The district court denied Peery's motion without a hearing, finding no bad faith because:

- the video segments in question were never in the government's possession, so *Trombetta* and *Youngblood* do not apply;
- the video segments had been by the trucking company, not by police or the State;
- the State was under no duty under *Brady* to affirmatively discover more video footage, particularly not on defendant's behalf; and
- the defendant was fully capable of subpoenaing the relevant videos from the company as part of her investigation and defense.

*Internal Video*

Peery's arguments about the internal video ignore the evidence that no such video ever existed. Hutchings, the vice president of compliance for the trucking company, testified that the semi-truck's internal camera could only be activated by him or someone in his department when they had reason to believe that the semi-truck driver was driving abnormally. The compliance department watched the external-facing camera footage and if it saw abnormal driving without an external explanation for it (such as an obstacle in the roadway), then it remotely activated the internal camera to see what the driver was doing. But here, because no abnormal driving by the semi-truck driver preceded the collision, this procedure was not activated and so no internal video was ever created. Thus, it would not have mattered if law enforcement had issued a subpoena for additional video footage on the day of the wreck. We cannot fault the State for failing to obtain and

19

preserve a video that never existed. Substantial competent evidence supports the district court's finding that the State did not act in bad faith for not producing an internal video.

*External Video*

To analyze Peery's arguments surrounding the external video, more facts are necessary. Throughout the case, the State made it clear that the only video it ever possessed from the semi-truck was the external video voluntarily turned over by the trucking company.

At sentencing, Peery raised her argument surrounding the video and produced a new version of the semi-truck video "that the trucking company had in its possession that they apparently didn't reveal to the State." This video was provided to the State after the jury trial by the trucking company. This "new" video shows the collision the same way as the video played for the jury (via State's Exhibit 1). But there are two differences between the "new" video and the video the jury saw. The "new" video is 20 seconds long, whereas the video played for the jury was 92 seconds long. And the "new" video has embedded data that shows the semi-truck's speed and the time of the collision by the Lynx system.

Peery argues that the jury lacked access to the speed and time data. But the same information was provided to the jury in the semi-truck's computer report, which Peery's expert reviewed. The jury was thus made aware of the semi-truck's speed and the time of the collision, which was the same as in the "new" video. And at the sentencing hearing, Peery conceded that the new video did not provide any additional footage. Still, Peery seemingly contends that because "new" video footage was found, other video footage must also have existed, so the State violated her due process rights by not obtaining and producing it.

20

We are unpersuaded. *Brady*, 373 U.S. at 87, applies only to evidence in the State's possession, not to "evidence which might conceivably acquire significance." *Johnson*, 297 Kan. at 217. To show a due process violation from the State's failure to preserve potentially useful evidence, "the defendant must show that the State acted in bad faith." 297 Kan. at 217-18. The United States Supreme Court has explained why bad faith is required:

> "[R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.

A determination of bad faith turns on the "officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *LaMae*, 268 Kan. at 551.

Testimony established that the trucking company's retention policy is as follows. Video footage is taken through the forward-facing windshield camera of the semi-truck and is uploaded into a database. When a wreck occurs, about 20 seconds of footage before and 20 seconds after the collision are automatically saved. The compliance department reviews the automatically saved video, and can save additional video footage to their server as needed and can retain it for as long as necessary. Any video footage not saved is automatically erased after six days.

To meet her burden, Peery would have to show that law enforcement understood within six days after the collision that more video footage of Russell's driving that day had potentially useful evidentiary value. But no evidence suggested that a longer video might have shown fault by Russell. To the contrary, nothing in the 92 seconds of video or in other facts known by the officers suggests that Russell may have been distracted while driving. The trucking company's compliance officer testified that nothing in Russell's

driving indicated he was distracted while driving. Law enforcement testified to the same, adding that based on the evidence on the scene, they found no need to get Russell's cellphone records to see if he had been texting—he was driving within his lane, was driving under the speed limit, and when Peery's vehicle slowed down, Russell appropriately moved his semi-truck away from her vehicle. Thus law enforcement had "no real reason to believe that he would be on a device."

By the time questions of additional external video evidence arose, the video had been purged under the company's standard retention policies. Peery has failed to show that law enforcement acted in bad faith by not subpoenaing additional video evidence. The district court's findings on bad faith as to any external video evidence are supported by substantial competent evidence. Thus, the district court correctly held that Peery's due process rights were not violated.

III.  *Does sufficient evidence support Peery's reckless involuntary manslaughter convictions and reckless aggravated battery convictions?*

Lastly, Peery argues that insufficient evidence supports her convictions for reckless involuntary manslaughter and reckless aggravated battery. Her brief separates these arguments into two issues, although we combine them as one. Peery argues that the State failed to prove beyond a reasonable doubt that (1) her acts, and not Russell's intervening acts, proximately caused the deaths and injuries of the girls; and (2) Peery's conduct was reckless—a gross deviation from the standard of care a reasonable person would use in the same situation.

*Standard of Review*

"When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder

could have found the defendant guilty beyond a reasonable doubt." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). An appellate court cannot "reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." 319 Kan. at 723. "[E]ven the gravest offense can be based entirely on circumstantial evidence. Sufficient circumstantial evidence does not need to exclude every other reasonable conclusion to support a conviction. [Citations omitted.]" *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

Reversal of a guilty verdict for insufficient evidence is a high bar. "It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." 316 Kan. at 350.

*The Crimes of Conviction*

Peery was convicted of three counts of reckless involuntary manslaughter under K.S.A. 21-5405(a)(1), which is defined as "the killing of a human being committed . . . [r]ecklessly." Peery was convicted of one count of reckless aggravated battery under K.S.A. 21-5413(b)(2)(A), which is defined as "recklessly causing great bodily harm to another person or disfigurement of another person." Peery was also convicted of one count of reckless aggravated battery under K.S.A. 21-5413(b)(2)(B), which is defined as "recklessly causing bodily harm to another person . . . in any manner whereby great bodily harm, disfigurement or death can be inflicted." "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j).

A.      *Sufficient evidence supports the jury's finding that Peery's acts proximately caused the deaths of and injuries to the girls in her vehicle. (Appellant's Issue III)*

Peery argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that her actions were the proximate cause of the girls' deaths and injuries because Russell's fault was an intervening cause of the girls' deaths and injuries.

The State was required to prove that Peery's actions were the cause of death and harm to the victims. See *State v. McCarley*, 287 Kan. 167, 179, 195 P.3d 230 (2008). When proximate cause is based on a chain of events, an intervening cause may absolve the defendant of liability. *State v. Wilson*, 308 Kan. 516, 522, 421 P.3d 742 (2018) (Unlawful conduct which is broken by an independent intervening cause cannot be the proximate cause of the death of another for a conviction for homicide.).

Peery argues that Russell's inattentive driving and his moving to the left lane caused the girls' deaths and injuries. She argues that Russell did not slow his speed even though the video shows that Peery's van slowed, braked, and had its left turn signal on in the right lane and when moving to the left lane to make her U-turn in front of Russell's semi-truck. She points to the opinion of her accident reconstructionist expert, who testified that had Russell stayed in the right lane and not tried to pass Peery at a close distance, Peery's van likely would have moved into the left lane by the time the semi-truck would have passed her on the right, thus avoiding the collision. Peery argues that the data also shows that Russell did not brake until just before the two vehicles collided, asserting that had Russell been more attentive, he would have braked earlier, avoiding the wreck.

But the jury was not persuaded by Peery's expert. On appeal we view all evidence in the light most favorable to the State when assessing sufficiency. *State v. Ward*, 292 Kan. 541, 581-82, 256 P.3d 801 (2011). And a "'jury is not bound to accept the

24

defendant's version of the incident in question and, having convicted the defendant, it is presumed to have believed the State's evidence and to have drawn from it all inferences favorable to the State.'" *State v. Hill*, 33 Kan. App. 2d 907, 911, 11 P.3d 178 (2005) (quoting *State v. Brunson*, 13 Kan. App. 2d 384, Syl. ¶ 2, 771 P.2d 938 [1989]). The record contains ample evidence that Peery's actions were the proximate cause of the girls' deaths and injuries.

Peery's argument that Russell was inattentive while driving is not supported by the record. Russell testified that he saw Peery's van on the side of the road, and it pulled out and was driving at a decent speed ahead of him. Russell did not testify that he passed her van on the right shoulder and then she passed him again on the highway. Russell testified that he then saw Peery abruptly brake in the right lane of the highway and she appeared to veer toward the right shoulder. In reviewing the semi-truck's video, Peery's expert agreed that Peery briefly moved her van toward the shoulder. Russell testified he could not see any reason for Peery's sudden decrease in speed, so he moved into the left lane to pass Peery. Soon thereafter, Peery suddenly turned left in front of his semi-truck. He braked but could not avoid a collision.

The semi-truck was inspected the same day to check for any compliance issues or possible contributors to the collision. During the inspection, law enforcement discovered that three of the brakes on the semi-truck were "beyond the adjustment limit," indicating a nonstandard level of wear or misalignment. Although this issue, if known, would have taken the semi-truck out of commission until it was fixed, the misaligned brakes still applied force, and the brakes still operated. No mechanical defects contributed to the wreck.

The speed on that strip of highway was 75 miles per hour; Russel was traveling around 70 miles per hour and had set his cruise control at 69 miles per hour before impact. Data from Peery's van's airbag control module included the previous five seconds

25

of information before the impact that caused the airbags to deploy. Its data showed that Peery braked from 55 to 12 miles per hour in the last 5 seconds before the collision.

According to Peery's expert's "Emergency Braking" chart, Russell would have needed to brake for about three seconds to avoid impact. But Peery starts turning to the left at 1.7 seconds to impact. No facts suggest that Russell was following Peery too closely before Peery slammed on her brakes right in front of him. Peery told officers that she knew the semi-truck was behind her, but she did not notice it switch lanes.

Peery's argument is that the semi-truck driver should have remained in the right lane because, as he was approaching her rapidly braking van at highway speed from behind and saw her left turn signal was on, Russell should have anticipated her illegal U-turn from the right lane, across the left lane, and through the barrier dividing the four-lane highway. But even Peery's expert did not go so far, admitting he was "not saying that I think the truck driver did anything wrong by going into the left lane."

An intervening cause may absolve the defendant of liability, but that intervening cause must be unforeseeable:

> "[A] cause-in-fact chain between a criminal act and a resulting [crime] remains intact so long as the latter links of the chain are reasonably foreseeable given the act in question. One of the ways the foreseeability chain can be broken is when an extraordinary event supersedes and becomes the sole cause of the victim's death. By extraordinary, we simply mean unforeseeable." *Wilson*, 308 Kan. at 522-23.

Thus if someone other than Peery was the sole cause of the children's deaths and injuries, then her conduct was not the proximate cause.

But the evidence by both the State and Peery's expert was that Russell saw Peery's van quickly and suddenly brake ahead of him on the highway. Russell could not see any

purpose for her doing so, so he moved into the left lane to pass Peery and give her space. Peery braked and decelerated in a few seconds from 55 to 12 miles per hour on a highway, knowing that a semi-truck was behind her. But then, without looking to see that all lanes were clear of traffic, Peery swung a bit to the right before suddenly turning her van hard left, directly in front of the semi-truck, to execute an illegal U-turn.

When determining whether Peery was guilty of reckless involuntary manslaughter and reckless aggravated battery, the jury was properly instructed to consider Russell's actions and any fault he may have had. The jury did so yet found Peery guilty on all counts. To absolve Peery from culpability, Russell's actions had to be unforeseeable, but they were not. See *Wilson*, 308 Kan. at 522-23. A reasonable juror could easily conclude that Russell's act of moving to the left lane was foreseeable, given Peery's acts of drastically slowing down in the right lane and moving toward the right. No intervening act occurred between Peery's decision to make the illegal U-turn and the collision.

Viewing the evidence in the light most favorable to the State, we find abundant evidence supporting the jury's finding that Peery's acts, and not Russell's, were the proximate cause of the girls' injuries and deaths.

B.     *Sufficient evidence supports the jury's finding that Peery's acts were reckless.*

Lastly, Peery argues the State presented insufficient evidence for the jury to find beyond a reasonable doubt that her conduct was reckless. She argues: (1) no evidence showed that she disregarded any risk, because she thought the semi-truck was behind her in the right lane, and the other two vehicles had safely made U-turns; and (2) the illegal act of making a U-turn on the highway, without an aggravating factor, was not a gross deviation from the reasonable standard of care because other cars did it too.

To show recklessness, the State was required to prove that Peery "consciously disregard[ed] a substantial and unjustifiable risk that circumstances exist[ed] or that a

27

result [would] follow, and such disregard constitute[d] a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 21-5202(j). We look at the totality of the circumstances in determining whether conduct is reckless:

> "[C]ould a jury rationally draw an inference of recklessness from the circumstances? In considering this question, cases from this and other jurisdictions have not focused upon the one piece of evidence on which the inference was based but have considered whether the inference is logical under the circumstances. One piece of evidence 'cannot be plucked out of the record and examined in a vacuum.'" *State v. Henson*, 287 Kan. 574, 588, 197 P.3d 456 (2008) (quoting *Godsey v. State*, 719 S.W.2d 578, 584 [Tex. Crim. App. 1986]).

1. *Peery consciously disregarded a substantial and unjustifiable risk of a collision when she tried to make an illegal U-turn, knowing a semi-truck was behind her.*

Peery contends that she had no reason to believe she was placing anyone in imminent danger because she thought the semi-truck was behind her in the right lane, she had no reason to expect Russell would suddenly switch lanes, and the two other women in the caravan had safely made U-turns. Peery relies on *State v. Jenkins*, 272 Kan. 1366, 39 P.3d 47 (2002). In that case, the Kansas Supreme Court determined that Jenkins, who had had seven prior accidents, knew of his epileptic seizure diagnosis yet disregarded it when deciding to drive. Because Jenkins disregarded the imminent danger of driving with his medical condition, sufficient evidence supported his convictions of reckless involuntary manslaughter. 272 Kan. at 1375. Peery argues that unlike Jenkins, she was unaware of any imminent danger and did not consciously disregard a known risk.

But *Jenkins* is not factually analogous to this case. Instead, *Hill* is more on point. In *Hill*, 33 Kan. App. 2d at 908, the defendant was convicted of reckless involuntary

28

manslaughter after he fell asleep while driving and hit and killed a road construction worker. On appeal, he claimed that erratic driving coupled with the "mere act of falling asleep" was insufficient to support a conviction for involuntary manslaughter. 33 Kan. App. 2d at 910-11. The *Hill* court disagreed, finding that realization of the danger could be inferred from the testimony of others. Thus, regardless of the defendant's assertion that he did not realize he was dozing at the wheel, other evidence, viewed in the light most favorable to the State, supported a conviction for involuntary manslaughter. 33 Kan. App. 2d at 913.

Here, as in *Hill*, Peery's realization of the danger and her conscious disregard of that danger can be inferred from the evidence presented at trial. Regardless of Peery's assertion that she thought the semi-truck remained behind her in the right lane, the evidence, viewed in the light most favorable to the State, shows Peery consciously disregarded a substantial and unjustifiable risk that her van would collide with the semi-truck behind her. Although her acts did not span several miles and occurred in merely several seconds, the facts show that she must have known that she was posing a danger to herself, her passengers, and motorists on the road by making the U-turn where she chose to do so, in the manner in which she chose to do so, and under the traffic conditions existing at the time.

Peery was driving down a highway with a posted speed limit of 75 miles per hour. The other occupants of her van were five young children, whom she could not verify were properly restrained. The highway carried a lot of traffic that morning. Peery took a call from Jones who explained that they had taken the wrong highway and needed to turn around. Peery told Jones that making a U-turn on the highway was illegal, so the jury could conclude that Peery understood the risk in the maneuver. When Peery called Bailey and learned they had already turned around, Peery told Bailey she planned to find a place to make a U-turn as well.

29

But Peery did not take the precautions that a reasonable person would have, in executing an illegal turn on the highway. Peery did not pull over to the right shoulder, stop her vehicle, then watch and wait for traffic to clear in all southbound lanes and all northbound lanes, before beginning her illegal U-turn through the opening in the barriers.

Instead, Peery, while looking for a place to turn around, saw the semi-truck behind her on the highway, then braked hard in the right lane of traffic, reducing her speed drastically to 12 miles per hour on the highway in front of an oncoming semi-truck. Peery then started turning left just 1.7 seconds before the impact, when the semi-truck was mainly in the left lane of traffic. Perry told law enforcement that the semi-truck must have switched lanes without her noticing. The jury could thus reasonably infer that Peery failed to make sure the left lane of traffic was clear before she began her left turn.

Peery tried to cross the left lane of the highway by making a left U-turn from the right lane. She knew that making a U-turn on the highway is illegal, that there was traffic on the highway, and that a semi-truck was directly behind her. But she disregarded these dangers even with five small children in the car, who may or may not have been wearing seatbelts. Peery made a sudden near-stop in the middle of the highway and failed to make sure the left lane was clear before turning across it toward the median.

Although no vehicles from the northbound side of the highway were involved in the collision, the video footage shows a northbound vehicle approaching the break in the barrier in the lane closest to it just as Peery is turning toward it. This is further evidence for the jury to reasonably infer that, under the totality of the circumstances, Peery chose to disregard the substantial and unjustifiable risk of a collision by executing the U-turn at the time and in the way she did so.

30

The reasonable inferences from the evidence overwhelmingly support the conclusion that Peery knew of and disregarded a substantial and unjustifiable risk that a vehicle collision causing severe injuries or death could occur from her acts.

2.  *Peery's disregard of the substantial and unjustifiable risk was a gross deviation from a reasonable standard of care.*

Next, Peery asserts that a traffic infraction alone cannot show a gross deviation from the standard of care, and that U-turns on this highway were common. Peery relies on *State v. Krovvidi*, 274 Kan. 1059, 58 P.3d 687 (2002), to argue that something more, like intoxication or cell phone distraction, is needed to support a vehicular homicide conviction, so something more is also needed to support her reckless involuntary manslaughter conviction. Compare K.S.A. 21-5406(c) (requiring conduct amounting to more than simple or ordinary negligence but not amounting to gross negligence to prove vehicular manslaughter); with K.S.A. 21-5202(j) (requiring "gross deviation from the standard of care which a reasonable person would exercise in the situation" for involuntary manslaughter).

True, in *Krovvidi*, the Kansas Supreme Court agreed that a "'mere violation of a traffic statute or ordinance through inattention, unless compounded by other operational misconduct, alcohol or drug impairment or other aggravating conditions or circumstances, will not support a conviction of vehicular homicide.'" 274 Kan. at 1070. There, the court reversed Krovvidi's conviction for vehicular homicide, finding that his inattentively running a red light did not constitute a "material deviation" from the standard of care which a reasonable person would observe under the same circumstances. 274 Kan. at 1074-75.

But the *Krovvidi* court rejected a bright-line rule that an aggravating factor is always required for a material deviation. Rather, the proper inquiry is to view the way the

31

driver operates his or her vehicle under the totality of the circumstances. 274 Kan. at 1069. Rather than a search for an aggravating factor, "the degree of deviation from the standard of care is the key to determining whether the defendant bears no criminal responsibility or may be convicted of vehicular homicide or involuntary manslaughter." 274 Kan. at 1068. See *State v. Allen*, 49 Kan. App. 2d 162, 179, 305 P.3d 702 (2013) (finding *Krovvidi* did not require evidence of an aggravating factor *independent* of a traffic infraction but a material deviation under the totality of the circumstances).

As the Kansas Supreme Court explained in another case:

"The totality of the circumstances must be considered. Identical conduct under different circumstances may result in no criminal responsibility, vehicular homicide, or involuntary manslaughter. For example, let us assume that a person is operating his vehicle at 60 miles per hour on dry pavements on a sunny day with little traffic at 4:00 on a Tuesday afternoon and he strikes and kills a pedestrian crossing the road. This same set of facts could be (a) no responsibility if it occurred in a remote, sparsely populated area; (b) vehicular homicide if it occurred in a residential area; and (c) involuntary manslaughter in a posted school zone. Even within these classes additional facts would have to be supplied before a definitive statement could be made." *State v. Makin*, 223 Kan. 743, 746, 576 P.2d 666 (1978).

See *Krovvidi*, 274 Kan. at 1068-69 (quoting *Makin* with approval); see also *State v. Randol*, 226 Kan. 347, 353, 597 P.2d 672 (1979) (same). We are thus unpersuaded by Peery's argument that evidence must show an aggravating factor to prove her recklessness.

What is more, Peery's acts, although inattentive, were not merely inattentive. True, no evidence showed that Peery was intoxicated or was distracted by her cell phone at the time of the collision. But Peery was not merely inattentive, as was Krovvidi. Although she did drive inattentively, she also chose to take affirmative acts that consciously

32

disregarded a substantial and unjustifiable risk that she would collide with the nearby semi-truck, as detailed above. She failed to exercise the caution and vigilance in looking for approaching vehicles in both directions that a reasonable person would have taken. Cf. *Honeycutt By and Through Phillips v. City of Wichita*, 247 Kan. 250, 263, 796 P.2d 549 (1990) ("'Look both ways before crossing the street' is a familiar teaching."). This disregard was a gross deviation from a reasonable standard of care.

We are similarly unpersuaded by Peery's argument that the fact that Jones and Bailey both made U-turns safely on the same highway that morning shows that Peery's attempt to do so was not a gross deviation from a reasonable standard of care. True, the record includes testimony by a law enforcement officer that U-turns on this highway, although illegal, are not uncommon. But these facts do nothing to show that Peery's attempt was not a gross deviation from a reasonable standard of care. *How* each driver committed their traffic infractions matters. Both Jones and Bailey pulled over onto the shoulder of the highway before making their turns. Jones testified that before crossing, she not only made sure that their side of the highway was clear of vehicles but also made sure that the other side was clear as well. Any reasonable person would have done the same.

Peery took no such precautions. When making her illegal U-turn, Peery braked hard in one lane of traffic, then turned across the other lane without looking to see where the semi-truck was that she knew to be behind her. Even if we assume that a reasonable person driving five children on a busy highway could have decided to make an illegal U-turn that day at the same location, Peery failed to take the simple precautions a reasonable person would have taken in doing so. Peery's driving infractions, her shocking choices in how, when, and where she tried to execute an illegal U-turn, and her lack of attention to other vehicles on the road resulted in the tragic collision and caused the needless deaths of three girls and serious injury or possible serious injury to the other two. Ample

33

evidence shows that under the totality of the circumstances, Peery's acts were a gross deviation from a standard of care that a reasonable person would exercise in the situation.

As the adage states, "a picture is worth a thousand words." The jury viewed the video from the semi-truck, as have we. It shows the extreme deviation of care by Peery's operation of her vehicle that day. A review of all the evidence in the light most favorable to the State shows overwhelming evidence that Peery's conduct was reckless. We unhesitatingly affirm her three convictions for reckless involuntary manslaughter and two convictions for reckless aggravated battery.

Affirmed.